THE ANACONDA COMPANY *v.* UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, A.F.L.-C.I.O., ET AL.

SUPERIOR COURT          JUDICIAL DISTRICT          FILE No. 044356
                         OF WATERBURY

Memorandum filed October 26, 1977

*Carmody & Torrance,* for the plaintiff.

*Bertram Diamond,* for the defendant.

HENEBRY, J. The plaintiff has brought this action seeking a temporary restraining order and a temporary and permanent injunction to restrain the defendants from carrying on certain allegedly illegal picketing at its plant in Waterbury, Connecticut. In its prayer for relief the plaintiff also seeks monetary damages and such other and further relief as to equity may appertain. The case involves a labor dispute within the meaning of § 31-112 of the General Statutes. It is the defendants' contention that under Connecticut law the court is powerless to restrain picketing so long as the picketing is peaceful and there is no evidence of violence. The plaintiff does not quarrel with that statement of the law, but claims that the picketing activity has not been peaceful, free from intimidation or lawful.

Insofar as this particular case is concerned, § 31-113 of the General Statutes does provide that injunctive relief cannot be granted to prevent a person or persons from (1) aiding by all lawful means any person participating or interested in any labor dispute; (2) giving publicity to the existence of, or the facts involved in any labor dispute, whether by advertising, speaking or patrolling or by any other lawful method; (3) assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute; and (4) advising or urging or otherwise causing or inducing by any lawful method the acts hereinbefore specified. The obvious purpose of this particular statute is to protect labor from the abuses of unrestrained issuance of injunctions in industrial controversies. In no way, however, does it render lawful any acts which before its enactment were unlawful. The effect of this statute is merely to curtail the jurisdiction of the court in the issuance of injunctions in labor disputes under certain specified conditions. *Schollhorn Co.* v. *Workers International Union,* 14 Conn. Sup. 22, 25.

In the case before the court, after an ex parte hearing held on October 7, 1977, pursuant to the provisions of § 31-115 of the General Statutes, a temporary restraining order, effective as of October 10, 1977, for a three-day period, was issued by the court proscribing certain conduct of the defendants which the court found to be illegal and beyond the pale of peaceful picketing.

The matter came before the court for a full hearing on the merits on October 12, 14 and 18. The temporary restraining order has remained in effect by order of the court to the date hereof. At the commencement of the hearing on October 12, both counsel, representing all of the parties, stipulated that a full hearing as to all of the issues would

be had, with the exception of the issue of monetary damages, in order to permit the court to enter a permanent rather than a temporary injunction if the court should decide that the evidence warranted the granting of injunctive relief.

From the evidence presented to the court, the following facts are found:

(1) The plaintiff, The Anaconda Company, is a Delaware corporation duly qualified to do business in the state of Connecticut, having offices and places of business in the city of Waterbury and town of Ansonia.

(2) The defendants, the United Automobile, Aerospace and Agricultural Implement Workers of America, A.F.L.-C.I.O., and Local 1078 of that union, are voluntary associations which represent for collective bargaining all production and maintenance employees of the plaintiff at the Waterbury plant of its brass division.

(3) Because of the inability of the parties to arrive at mutually acceptable terms as to employment, compensation and other things, after a prior contract had expired, a strike was called by the defendant unions at midnight or shortly thereafter in the morning hours of October 1, 1977, and has continued in effect since that time.

(4) It had previously been decided by the plaintiff that only the Bank Street and South Main Street gates of its Waterbury plant would be left open for ingress and egress during the impending strike.

(5) On October 5, a self-employed building maintenance worker under contract with the plaintiff was held up in his vehicle for approximately fifteen minutes outside the Bank Street gate. He was first asked for identification by two pickets and

while this was taking place, one of the two "belted" the vehicle's mirror and then announced that he had been hurt. There were ten to fifteen pickets on the line at the gate. The driver was compelled to seek out a police officer and request that he be admitted to the plant. The pickets made two passes in front of his vehicle before he gained admission.

(6) Inspector Arnold Mark of the Waterbury police department was in charge of prescribing rules as to picketing procedures. He testified that he allowed two passes to be made by the pickets in front of each vehicle before the car would be permitted through the gates. It was also his decision to permit up to ten to fifteen pickets at the South Main Street gate and up to twenty pickets at the Bank Street gate. He did indicate that if a court were to order fewer passes by the pickets, he would be willing to carry out that order. He further conceded that since the temporary restraining order of the court had gone into effect on October 10, 1977, no delays were being encountered. He had originally announced the two-pass rule at a meeting of representatives of the union and the company on October 5. He could not recall whether the company representatives had or had not objected to his announcement when the strike was called that two passes by the pickets in front of each approaching vehicle would be permitted. He did recall that company representatives had thereafter complained to him of the excessive delays being encountered by office and management personnel upon entering and exiting from the gates.

(7) Since inception of the strike some two hundred management and office personnel have been reporting to work in about sixty cars. In order to reach a production level of at least 30 percent of

what would normally be attained, many of those employees have been requested to serve on production jobs.

(8) On Monday, October 3, with approximately sixty pickets stationed at the Bank Street gate, the delay or waiting time for all cars to enter the plant was approximately one and one-half hours. On Tuesday, October 4, the situation did improve to the extent that the total delay time was reduced to approximately one hour. The delay experienced prior to the issuance of the temporary restraining order on October 10 ranged from one to five minutes for each car, or a total average time for all cars to enter and leave the plant of one to two hours.

(9) Since Tuesday, October 4, the number of pickets at the Bank Street gate has ranged from eleven to seventeen and at the South Main Street gate from four to seven. Because of the inordinate delays the company has been compelled to stagger the working hours of a portion of the personnel and to require them, where possible, to pool together for transportation in order to reduce the number of cars which, at any given time, are waiting for entry to the plant. That arrangement will probably not be able to continue for any extended period of time because of the inconvenience imposed upon the personnel.

(10) The temporary restraining order was imposed by the court on Monday, October 10, 1977.

(11) Since the temporary restraining order has gone into effect the delays have been virtually minimal.

(12) Prior to the issuance of the temporary restraining order the delay time in question was interfering with the normal duties to be performed and was beginning to have an adverse effect on

production as well as shipping schedules. The plaintiff has suffered irreparable harm as the result of the unlawful acts of the defendant unions.

(13) The picketing procedures outlined by the Waterbury police department have been approved by the defendant unions. The Waterbury police department is unwilling to change the procedures without an order from the court.

(14) The plaintiff, by letter of October 7, 1977, offered to submit the underlying labor dispute to mediation by the state labor commissioner.

(15) Commissioner William M. Hannon of the Federal Mediation and Conciliation Service has also met with the parties on two occasions to assist in the resolution of the dispute.

(16) Some 2500 employees of the plaintiff's company are involved in the present strike which is taking place at the six plants located in Ansonia and Waterbury, Connecticut; Buffalo, New York; Kenosha, Wisconsin; Detroit, Michigan; and Paramount, California. Labor negotiations between the plaintiff and the striking parties have also taken place in Boston.

At the conclusion of the plaintiff's case the defendants filed a motion to dismiss on the grounds that the plaintiff had failed to establish a prima facie case and that the actions and conduct of the defendants constituted nothing more than peaceful picketing which failed to attain a level of unlawful conduct. The court reserved its decision on the matter until the conclusion of the case, both counsel concurring in the reservation. The court has carefully reviewed the evidence presented in behalf of the plaintiff and concludes that there was sufficient evidence presented to support a prima facie case that the defendants' conduct went beyond the

limits of lawful picketing by unduly delaying and hampering the plaintiff's officers and employees from entering and exiting the premises in question. The motion to dismiss is, therefore, denied.

The question now before the court is whether, on all of the evidence, the actions and conduct of the defendants amounted to peaceful picketing or constituted unlawful conduct.

"The term 'peaceful picketing' implies not only the absence of violence but the absence of any unlawful act. . . . It precludes any form of physical obstruction or interference with an employer's business . . . and should not go beyond the area of peaceful persuasion." *Turner & Seymour Mfg. Co. v. Torrington Foundry Workers Local 1699,* 18 Conn. Sup. 73, 75–76; *Schollhorn Co. v. Workers International Union,* 14 Conn. Sup. 22, 25.

The boundary between lawful and unlawful conduct is that between peaceful persuasion and intimidation. In the case of intimidation, unlawful conduct can be found to exist even in the absence of actual physical violence or express threats of physical injury to person or property. *Turner & Seymour Mfg. Co. v. Torrington Foundry Workers Local 1699,* supra, 76.

"To intimidate is to inspire with fear, to overawe or make afraid. Fear may be inspired without physical violence or spoken threats, moral intimidation may be accomplished by a menacing attitude and a display of force which may coerce the will as effectually as actual physical violence. The gathering of strikers in considerable numbers at the entrance of a factory with threatening attitude toward employees, who must run the gauntlet of a hostile picket line in going to and from work, may overawe and make them afraid by a show of force which itself is intimidating. The well con-

sidered authorities all hold that the conduct of a strike may be such as to constitute intimidation though there is no use of force or physical violence." *Levy & Devaney, Inc.* v. *International Pocketbook Workers Union,* 114 Conn. 319, 322.

Interference with a free right of ingress and egress to and from a plant by those who had such a right is unlawful. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U.S. 184. Mass and circular picketing is in the same category. *Goldfinger* v. *Feintuch,* 276 N.Y. 281, 286.

In the opinion of the court, the conduct of the pickets in the present case in interfering with those having business with the plaintiff by a show of force and by picketing in close formation and by mass stationary picketing so as to block the gate and unduly delay those wishing to enter or exit from the plant premises constituted unlawful conduct and is not within the realm of lawful picketing.

It is the further conclusion of the court that, if relief is not granted, the plaintiff will suffer irreparable injury for which there exists no certain pecuniary standard for the measurement of damages. *Turner & Seymour Mfg. Co.* v. *Torrington Foundry Workers Local 1699,* supra, 80, 81.

The court therefore finds (a) that unlawful acts as set forth more fully above have been threatened and will be committed by the defendants unless restrained and, further, that the acts or conduct of the picketers were authorized or ratified by the United Automobile, Aerospace and Agricultural Implement Workers of America, A.F.L.-C.I.O., and Local 1078 of that union; (b) that substantial and irreparable harm to the complainant or its property will follow; (c) that greater injury will be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the

granting of relief; (d) that the complainant has no adequate remedy at law; and (e) that the public officers charged with the duty of protecting the plaintiff's property are unable or unwilling to furnish adequate protection.

A further issue to be resolved in the present case involves an interpretation of § 31-117 of the General Statutes. That statute provides that no temporary injunction may be made permanent unless the plaintiff alleges and proves that the commissioner of labor has been notified in writing of the plaintiff's willingness "to submit such labor dispute to arbitration or mediation." The letter which the plaintiff had sent to the commissioner of labor to satisfy the requirements of § 31-117 stated as follows: "Commissioner William M. Hannon of the Federal Mediation and Conciliation Service's Hartford office has met with the parties on two occasions and is actively following the contract negotiations. In order to fulfill the requirements of Sec. 31-117 of the General Statutes of Connecticut, and as is evidenced by the aforesaid participation of Commissioner Hannon, you hereby are notified that the company is willing to submit said labor dispute to mediation."

It is the plaintiff's position that the clear language of the statute is in the alternative, and that since the evidence indicates that the commissioner has been notified in writing of the plaintiff's willingness to mediate, the requirement has been met. The defendants, on the other hand, argue that the statute requires that the plaintiff evidence a willingness to submit to both arbitration and mediation.

It is the further contention of the plaintiff that even if the statute might be read to require arbitration, there is no governmental machinery for arbitration of contract negotiations available to these parties, and that the requirement of § 31-117 does not apply.

Section 31-117 requires notice of the plaintiff's willingness "to submit such labor dispute to arbitration *or* mediation." (Emphasis added.) The plaintiff contends that this language is clear and unambiguous, and that there is no requirement or authority for the court to go beyond such language. *Colli* v. *Real Estate Commission,* 169 Conn. 445; *Holmquist* v. *Manson,* 168 Conn. 389.

It has been held that " '[t]he use of the disjunctive "or" between the two parts of the statute indicates a clear legislative intent of separability.' " *Bahre* v. *Hogbloom,* 162 Conn. 549, 557; *State* v. *Dennis,* 150 Conn. 245. While it is perhaps conceivable that the legislature intended the word "or" to mean "and," as the defendants would insist, there is no "clear and unmistakable" legislative intent to do so, and the term "or" should be given its common meaning. *Gunzer* v. *New Fairfield,* 19 Conn. Sup. 231, 235. If the legislature had not wished to have the import of the statute be in the disjunctive, it could have very easily so ordained.

The court construes § 31-117 as giving the plaintiff the choice of mediation *or* arbitration, requiring only that it submit to conciliatory assistance in one of those manners.

The defendants rely upon the case of *Landers, Frary & Clark* v. *United Electrical Workers,* 19 Conn. Sup. 402, in support of their argument that the plaintiff must submit to both arbitration and mediation. That case does state that such a requirement exists when a temporary injunction is to be made permanent. Even if correctly decided, the court feels that the holding is inapplicable to the present situation. The memorandum of decision in that case does not provide information as to the nature of the underlying labor dispute, as, for

example, whether it was a grievance or full contract negotiations. Thus, *Landers* is difficult to apply strictly to the circumstances of this case.

But even on its face, the *Landers* decision is inapplicable to the circumstances before this court. The most significant aspect of the *Landers* decision is that a temporary injunction was already in effect and continued in effect after the decision. The court there specifically noted that the plaintiff employer's rights were protected by that temporary injunction. If injunctive relief were to be denied in this case, such protection would not exist because the present temporary restraining order would dissolve. Thus, the plaintiff could again be exposed to the unlawful acts shown to have preceded judicial restraint of these defendants. The *Landers* decision must be seen as comprehending the time framework inherent in § 31-117, namely, that a plaintiff employer is entitled to a measure of protection from unlawful picketing prior to any submission to the conciliatory efforts of the commissioner of labor. To apply the ruling in *Landers* on a purely mechanical basis in this case, where the judicial proceedings have been foreshortened, would certainly frustrate the intent of that ruling, as well as the intent of the statute, to encourage settlement of labor disputes. The foreshortening of the judicial proceedings in this case, at the express request of the defendants, presents this court with a unique situation in which the *Landers* decision ought not to be given its full effect.

The underlying dispute between the parties to this action is an impasse in bargaining for a new contract. While the parties to this action may reside in Connecticut and be theoretically available to the commissioner of labor, the parties to the underlying labor dispute are not within the jurisdictional limits of Connecticut. The evidence indi-

cated that collective bargaining had taken place in Boston on a national basis. The plaintiff's plants in Detroit, Michigan, Paramount, California, Buffalo, New York, and Kenosha, Wisconsin, as well as the Ansonia and Waterbury plants, are involved. The local unions in all of those plants are parties to the negotiations, but not parties to the action. The Connecticut commissioner of labor would hardly be able to resolve the labor dispute in the absence of those parties from the other four states. As such, his efforts at arbitration, even if required by § 31-117, would be futile, and should not, therefore, be a requirement for the equitable relief sought. See *Donnelly Garment Co.* v. *International Ladies' Garment Workers' Union*, 99 F.2d 309, 317 (8th Cir.), cert. denied, 305 U.S. 662.

The defendants also rely on the holding in *Brotherhood of Railroad Trainmen* v. *Toledo, Peoria & Western Railroad*, 321 U.S. 50. In that case the United States Supreme Court, interpreting the Norris-LaGuardia Act and the Railway Labor Act, held that a federal court must deny injunctive relief to a railroad against its striking employees unless the railroad has submitted itself to arbitration of the underlying labor dispute.

The case is distinguishable for a number of reasons, one of which is that it concerned a railroad strike in the immediate aftermath of the bombing of Pearl Harbor, with considerable pressure to settle being placed on both sides. The case also concerned restrictions upon the powers of a federal court to issue a labor injunction. The United States Supreme Court has consistently held that the power and authority over local violations of law should remain in the state courts. *United Mine Workers* v. *Gibbs*, 383 U.S. 715, 721; *San Diego Building Trades Council* v. *Garmon*, 359 U.S. 236, 247. But the *Brotherhood* decision is primarily distinguish-

able because it deals with the Norris-LaGuardia Act in connection with the Railway Labor Act, and not with the Connecticut statute here in question. The Norris-LaGuardia Act, 29 U.S.C. § 108, provides that an employer must "make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration." The court read this language in the context of the Railway Labor Act, which governed the labor relations between the parties and which provides: "It shall be the duty of all carriers, their officers, agents and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152. Section 4 of the Railway Labor Act establishes a national mediation board to resolve disputes under the act. Section 5 requires the board, upon its invocation for mediation and the failure of that mediation, to endeavor to induce the parties to submit their dispute to arbitration, in accordance with the provisions of the act.

The United States Supreme Court's decision in *Brotherhood of Railroad Trainmen* v. *Toledo, Peoria & Western Railroad,* supra, points directly to that available governmental machinery for arbitration. It notes (p. 58) that the terms of the Norris-LaGuardia Act "show they were used in explicit contemplation of the procedures and machinery then existing under the Railway Labor Act and with the intent of making their exhaustion conditions for securing injunctive relief, not singly or alternatively, but conjunctively or successively,

when available. This purpose of Congress is put beyond question when the section's legislative history is considered in the light of the history and the basic common policy of the two statutes, the Railway Labor Act and the Norris-LaGuardia Act."

The *Brotherhood* decision, in holding that equitable relief should be denied to a railroad which did not submit to the arbitration expressly provided under the Railway Labor Act, should be limited to the context of that act and the governmental machinery available under it. And, in fact, the *Brotherhood* decision has almost uniformly been cited in decisions involving the Railway Labor Act. In cases outside of that act, where the parties have been governed by the National Labor Relations Act, the *Brotherhood* case either has not been cited or has been distinguished.

In *Charles D. Bonanno Linen Service, Inc.* v. *McCarthy,* 532 F.2d 189 (1st Cir.), the court, in affirming the granting of injunctive relief to an employer in a labor dispute, held that the rule of the *Brotherhood* case did not apply where the arbitration machinery of the Railway Labor Act did not exist. "Such machinery does exist in the Railway Labor Act, 45 U.S.C. § 151 *et seq.,* in the context of which . . . [*Brotherhood*] arose, but there is no parallel machinery in the present context." Id., 191.

Since the existence in four other states of other parties to the negotiations which form the underlying labor dispute undoubtedly precludes the Connecticut labor commissioner from any effective efforts to arbitrate that dispute, any statement of the plaintiff's willingness to submit the dispute to arbitration would be a futile gesture.

The defendants may also have waived their right to the preliminary requirement of § 31-117 by their conduct in this case. There is no indication that

they, themselves, submitted to or sought any arbitration by the commissioner of labor. Such a failure under the Norris-LaGuardia Act and the Railway Labor Act has been held to remove a similar requirement from the employer. *Charles D. Bonanno Linen Service, Inc.* v. *McCarthy,* supra, 191; *Piedmont Aviation, Inc.* v. *Airline Pilots Association, International,* 416 F.2d 633, 638–39 (4th Cir.).

It should also be noted that the services of a federal mediator have already been engaged in an attempt to resolve this dispute on a national level. The defendants in this case would have the court require that the dispute be submitted immediately to the Connecticut commissioner of labor for arbitration. But such a submission, if it were to have any effect, would necessarily frustrate the efforts of the federal mediator in the national context. The defendants' position of insisting upon a strict interpretation and application of § 31-117 becomes somewhat untenable under the circumstances.

The court is of the opinion that, under all of the circumstances, the offer of the plaintiff as made to the labor commissioner, pursuant to § 31-117, to mediate the dispute was sufficient to satisfy the requirements of that statute.

For all of the reasons stated, a permanent injunction shall issue.