HARTFORD DIVISION, EMHART INDUSTRIES, INC. *v.* AMALGAMATED LOCAL UNION 376, U.A.W., ET AL. (11752)

PETERS, HEALEY, PARSKEY, SHEA and GRILLO, Js.

---

Argued March 4—decision released June 14, 1983

*J. William Gagne, Jr.,* with whom, on the brief, was *David A. Swaine,* for the appellants (defendants).

*Henry J. Kelston,* with whom, on the brief, was *Burton Kainen,* for the appellee (plaintiff).

ARTHUR H. HEALEY, J. The plaintiff in this case is the Hartford Division of Emhart Industries, Inc. (Emhart). Emhart operates a manufacturing plant located in Windsor. The defendant, Local 376 of the International Union of United Automobile, Aerospace

& Agricultural Implement Workers of America (union), is the certified bargaining representative of Emhart's employees. There are also six individually named defendants. Philip Wheeler, James Bowen and Robert Madore are all officers of the union; Wheeler is president, while Bowen and Madore are the business agents for the union. Joseph Belliveau, Felix Velez and George Johnson are all employees of Emhart and members of the union. In addition, Belliveau is the shop chairman for the union, and Velez and Johnson were designated as "picket captains" for the union by Wheeler.

At midnight on September 12, 1982, the then existing collective bargaining agreement between Emhart and the union expired. Because the parties were unable to negotiate a new contract, the union commenced a strike against Emhart immediately upon the expiration of the old contract. The union began picketing the plant on Monday morning, September 13, 1982. On Wednesday, September 15, 1982, Emhart filed a verified complaint and an application for a temporary restraining order, a temporary injunction and a permanent injunction, alleging that the union and the individually named defendants were engaged in unlawful conduct. Hearings on Emhart's request for injunctive relief began on September 17, 1982, and concluded on October 5, 1982. On October 13, 1982, the trial court, *Kremski, J.,* filed a "Memorandum of Decision and Finding of Facts," in which it found that there was a basis for issuing a temporary injunction. It, therefore, granted Emhart's request for a temporary injunction, attaching a copy of its order to the memorandum.[1] The defendants appealed from this order on October 25, 1982.

[1] The temporary injunction entered by the court stated as follows:
"NOW THEREFORE, it is
"ORDERED that the Defendants and all their members, officers, agents, or employees, and all persons acting in concert with or otherwise par-

Although the defendants have raised a number of issues in their brief, these issues can be synthesized into three broad claims.[2] Their first claim is that, pursuant to the criteria set forth in General Statutes §§ 31-114[3] and 31-115,[4] there was insufficient evidence to justify

ticipating with the Defendants hereto or any of them or acting in their aid or behalf or under their direction, supervision or control be and they hereby are enjoined, restrained and prohibited from:

"A. Congregating in mass and engaging in mass picketing, or otherwise in close formation around the entrance or leading to the entrance of plaintiff's premises at Day Hill Road, Windsor, Connecticut, in such a way as to block said entrance and prevent, interfere with or impede entrance into or egress from said premises or streets leading to said premises by plaintiff's officers and employees, members of the public and persons doing business with the plaintiff who may wish to enter or leave.

"B. By force, violence or intimidation, or threat of force or violence, or by the use of offensive language or gestures, impeding or interfering with plaintiff's officers or employees, persons doing business with the plaintiff or members of the public who may wish to enter or leave the plaintiff's premises.

"C. Stationing, maintaining or allowing to remain at the entrances to said premises a greater number of picketers to group or conduct themselves in a manner different from that prescribed by the Court or a maximum of ten (10) picketers, who shall maintain two yard intervals between them at the entrance to the plaintiff's premises.

"D. Threatening or intimidating employees or officers of the plaintiff or members of their families, and threatening to damage or injure the property of the plaintiff or its officers or employees, or members of the public, and persons doing business with the plaintiff in any manner.

"E. Interfering in any unlawful way with the operation of plaintiff's business."

[2] The defendants have actually briefed eleven issues on appeal.

[3] General Statutes § 31-114 provides: "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court for the unlawful acts of individual officers, members or agents, except upon proof of actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof."

[4] General Statutes § 31-115 provides: "No court shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, except after hearing the testimony of witnesses in open court, with opportunity for cross-examination, in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after a finding of facts by the court, to the

the issuance of a temporary injunction against any of the individually named defendants or the union. Their second claim is that the injunction issued by the trial court was overly broad and vague. Finally, they claim that the trial court erred in admitting into evidence certain documents as full exhibits.

At the time that the strike began there were 318 union members[5] working at Emhart's plant in Windsor, and 287 nonunion employees. There are four entrances to the plant. Two of the entrances open onto

---

effect: (a) That unlawful acts have been threatened and will be committed by a person or persons unless such person or persons are restrained therefrom, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act except against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; (b) that substantial and irreparable injury to the complainant or his property will follow; (c) that as to each item of relief granted greater injury would be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the granting of relief; (d) that the complainant has no adequate remedy at law; and (e) that the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection. Such hearing shall be held after notice thereof has been given, in such manner as the court directs, to all known persons against whom relief is sought, provided, if a complainant also alleges that, unless a temporary restraining order is issued without notice, substantial and irreparable injury to the complainant or his property will be unavoidable, such a temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. Such temporary restraining order shall be effective for no longer than three days and shall become void at the expiration of such three days, provided, if a hearing on a temporary injunction has begun before the expiration of such three days, the restraining order may, in the court's discretion, be modified or continued until a decision is reached by said court. No temporary restraining order or temporary injunction shall be issued except on condition that the complainant shall first file an undertaking, with surety satisfactory to the court granting the injunction, to answer all damages in case the plaintiff in the action in which the injunction is applied for fails to prosecute the action to effect."

[5] Local 376 was the only union representing the employees at Emhart's Hartford Division for the purposes of collective bargaining.

Day Hill Road in Windsor, while the other two open onto Addison Road. Once the picketing began, however, only one entrance was used except for limited time periods. This entrance was designated as Gate A on a map of the plant introduced into evidence by Emhart, and was referred to as such throughout the proceedings. The decision to utilize one entrance was apparently reached after the chief of the Windsor police force, Maxie L. Patterson, cautioned Emhart officials against the use of all four gates. Chief Patterson testified that he told the officials: "That for them to utilize the gates, it would require a considerable amount of manpower on my part to insure that the vehicles could be safely gotten in, that traffic could be adequately handled to preclude any serious injuries, and particularly along Day Hill Road, because we're talking about a peak traffic hour period, at approximately —from the time period of seven o'clock until eight o'clock in the morning, and also the evening hours, when the plant lets out, and at the time frame of approximately four twenty p.m., and I did express to him that I did have some reservations about the safety of being able to utilize those gates."

Picketers began to arrive at the plant at around 5 a.m. on Monday, September 13. From that date until the date of the hearings, the defendants admit that picketing took place on a 24 hour basis. A number of employees testified to delays of up to two hours caused by the picketing, particularly during the peak rush hours in the mornings. One employee also testified to a similar delay when he attempted to leave the plant on the afternoon of the first day of picketing. In addition, Emhart introduced into evidence, over the union's objection, the time cards of the employees who reported to work, as well as a summary of the hours they lost during the first week of the strike. The summary in-

dicated that the total number of hours lost due to strike delay was 1248. These delays were a result of the manner in which the picketing was conducted. The court found that the defendants "picketed in mass" at the gate to the plaintiff's plant. The picketers would walk in a circular line in the driveway leading to Gate A. No car was permitted to pass through this circular line, either to enter or to leave the plant, until the picketers made a full rotation. The trial court estimated that anywhere between ten and thirty pickets would walk in the circle, with each rotation taking between one and one-half and two minutes. The court found that the rate at which vehicles were permitted to pass through the picket line was from 30 to 40 per hour. This, in turn, caused the traffic to back up for a number of blocks impeding traffic on the adjoining streets. The court found that the pickets employed the same tactics when the plaintiff's employees were leaving the premises. Furthermore, although the court found that the number of picketers walking in the circular picket line was ten to thirty, there was also testimony that the actual number of picketers surrounding the plant was, at times, much greater.

The picketers intimidated some nonstriking employees who attempted to enter the plant by subjecting them to verbal abuse and to verbal threats. In addition, one employee testified that he observed a picketer copying down license plate numbers of the cars that drove through the picket line. There was also evidence of individual acts of violence and vandalism. At one point, on Monday, September 20, about fifty picketers surrounded a nonstriking employee's blue Honda automobile and jumped up and down on it, kicked its sides, pounded on the roof, scratched some paint off and cracked its windshield, and also verbally threatened the driver. This incident led to the arrest of one of the picketers.

There were also reports introduced into evidence, over the defendants' objection, which were prepared by agents of Burns International Security Services, Inc., whose duties included securing the building and the property and filling out these reports. Certain of these reports indicated that on three separate occasions people having business with Emhart drove up to the plant and were either verbally harassed or prevented from entering. On one occasion, a bottle was thrown at a vehicle. There were also numerous reports that on different days unidentified strikers would drop or throw glass bottles and ball bearings on the premises of the plant.

There was substantial evidence describing the action of the union and the individual defendants during the strike. The union president, Wheeler, testified that it was the union's normal procedure to set up a rotational picket line and to let cars pass through only after the picketers had completed a full rotation. There was testimony that Felix Velez, whom Wheeler appointed along with George Johnson to take care of the picketers, was controlling the picket line and determining when to let cars pass through the line. There was also testimony that all six of the individual defendants were near the gate while picketing was going on and that Bowen, Belliveau, Johnson and Velez actually participated in the picketing. Furthermore, as has been previously noted, while the picketing was taking place the people who went through the line were subjected to verbal harassment. One of the police reports introduced by Emhart stated that the "labor leaders"[6]

---

[6] We agree with the defendants that a trial court should view with skepticism a report attributing such a broad claim to an indefinite group of people such as "labor leaders," especially where the officer who wrote the report is not in court to testify. The report, however, was admissible and, under the circumstances of this case in which it was consistent with other evidence, it could be given credence by the trial court.

aggravated the situation on one occasion by inform-
ing the picketers that they "could legally continue"
being verbally abusive towards the occupants of the
vehicles passing through the picket line.

In addition, Wheeler testified that he was present at
the time of the incident that occurred on September
20, where a nonstriking employee's car was surrounded
and repeatedly battered by a group of picketers who
also subjected the driver to verbal threats. Rather than
directing his attention to curtail the actions of the
picketers, however, Wheeler yelled at the guard, tell-
ing him to open the gate.

In regard to the activity of the police in supervising
the picket line it is evident from the record that, for
the most part, from Monday, September 13, when the
picketing began, until Thursday, September 16, the
police took little action to prevent the picketers from
engaging in their rotational picketing. It is also clear,
however, that the police did not determine how the
picketers should conduct their picket line. When the
police arrived on the first day that the picketing started,
September 13, the picketers had already established
their procedure of letting one car through after each
revolution. Wheeler himself testified that this was what
they normally did. Furthermore, when Chief Patter-
son talked to Wheeler at that time about the "in-
dividuals [picketers] interfering with the flow of the
traffic going through," Patterson testified that "he
[Wheeler] basically did not want to discuss it." When
the traffic began to back up the first day of the strike,
a police report filed by Lieutenant Nick Riccio indicates
that when he attempted to discuss the situation with
Wheeler, Wheeler "was adamant and belligerent that
he was going to operate in this manner and that he had
no intentions of altering his plans." Another police
report describes an incident that took place on Thurs-

day, September 16, when a police officer tried to make an adjustment in the picket line because he felt that the picketers were making more than one revolution before letting a car through. The report states that when he tried to let a car through, Felix Velez became upset and hostile and started yelling and cursing at the officer. This incident led to Velez's arrest.

The police did take affirmative action on Friday, September 17. On that afternoon Chief Patterson assigned approximately thirty officers to the plant area, whereas he had initially assigned only eight or nine per shift. He had a police commander announce over the public address system that any individual blocking the driveway was violating state law and that they had to move out of the way. Failure to do so, he informed them, would result in their arrest. Rather than obey these orders, Bowen, Madore and Velez walked into the middle of the driveway leading to Gate A. Chief Patterson testified that Bowen "called for all of the individuals standing in and around the area, to come out into the middle of the driveway, and, you know, to further block the driveway." Bowen, Madore and Velez were then arrested, with Madore having to be physically subdued by the police. The police then made a wedge through the picketers in order to separate them to either side of the driveway so that the traffic could proceed through the gate unimpeded. After the police line had been formed, and cars started coming out of the plant, two more union members who had been picketing broke through the line and blocked the cars from exiting. They, too, were arrested. In order to increase the flow of traffic in and out of the plant, the police utilized this procedure for moving the picketers off the driveway from that date until the time that the court hearings were proceeding. Once the police left their positions at the driveway, however, or

before they arrived, the picket line would form up again and the picketers would follow their normal procedure.[7]

Chief Patterson also testified in regard to the ability of his force to continue monitoring the picketers. As previously noted, the contingent of officers assigned to the plant during the strike was eight or nine per shift and this eventually decreased to four to seven officers per shift. On the afternoon of Friday, September 17, however, the police chief assigned thirty officers to the plant in order to move the picketers away from the entrance to the plant. Thereafter, this task required a contingent of between thirteen and twenty officers each morning and afternoon to expedite ingress to and egress from the plant. Three of these officers were detectives. The extra officers, many of whom were on overtime, had to report two hours earlier than normal in the morning and one hour earlier in the afternoon, although only a portion of this time was spent actually clearing an entrance to the plant.

The police chief testified that "hopefully" he would not have to continue assigning this number of officers to the plant because it was "basically seriously impairing the operation of the police department." He then went on to explain how his department's operations were being impaired: "The composition of these officers that is resulting from pulling officers from other details

---

[7] The occasion when the blue Honda was damaged as previously mentioned happened after the police had left their position at the driveway. Paul Landry, an electrical engineer at the plaintiff's plant, arrived for work on September 20 at about 7:55 a.m.; his usual hours were from 8:10 a.m. to 4:20 p.m. He was driving the blue Honda automobile referred to earlier. When he arrived, the larger contingent of police had left and Gate A was closed. Gilbert Lang, a picketer who witnessed the blue Honda incident, testified that a police officer asked Landry where he was at 7:30 a.m. and Lang said the officer told Landry, "Well, you're on your own now." Although the officer attempted to aid Landry, the incident, nevertheless, took place.

and other assignments. Basically, the detective bureau is literally stripped. Detectives aren't following up on criminal investigations and burglaries and other type of criminal incidents. Other traffic posts that are normally manned in the morning and the evening, at a major traffic intersection, is [sic] not being manned, because of having had to pull that individual officer. All of the special assignment officers have been pulled from various details. The crime prevention officer, all of the administrative officers, all available supervisors have been placed on the assignment, and I just physically can't continue to do that."

We now turn to the issues raised by this appeal. Because some of the underlying facts relied upon by the plaintiff in seeking an injunction were contained in documents which the defendants claim were inadmissible, we will deal with the evidentiary issues first. We will then address the question of whether Emhart introduced sufficient facts to warrant the issuance of an injunction pursuant to General Statutes §§ 31-114 and 31-115. Finally, we will discuss the issue of whether the actual injunction issued was overly broad or vague.

## I

### EVIDENTIARY CLAIMS

The defendants claim that the trial court erred by admitting three sets of records into evidence as full exhibits over the objections of the defendants' counsel.[8]

---

[8] In oral argument, counsel for Emhart contended that this issue was not properly before us because the defendants failed to include it in their preliminary statement of issues. A review of the file, however, indicates that the defendants filed an amended preliminary statement of issues before they submitted their brief, in which the evidentiary claims were raised. Practice Book § 3012 (d) permits a party to file as of right any of the papers referred to in that rule (including preliminary statements of issues) at any time prior to that party filing his brief. We will, therefore, address this issue.

The three sets of records consist of the following: (a) police reports filed by officers of the Windsor police force assigned to the plant during the strike; (b) "incident reports" filed by employees of Burns International Security Services, Inc. (Burns Security); and (c) time cards of nonstriking employees reflecting the amount of time they lost due to the strike as well as a summary sheet of data compiled from those cards. The defendants claim that the court erred in concluding that these documents satisfied the business entry exception to the hearsay rule as set forth in General Statutes § 52-180. It should be noted at this point that the defendants do not claim on appeal that the court erred in admitting any particular record. Rather, the claimed errors in admitting each of the three sets of records apply to each set as a whole.

To be admissible under the business record exception to the hearsay rule, a trial court judge must find that the record satisfies each of the three conditions set forth in General Statutes § 52-180.[9] The court must

---

[9] General Statutes § 52-180, as it existed at the time of the trial, provided as follows:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible as evidence of such act, transaction, occurrence or event, if the trial judge finds that it was made in the regular course of any business, and that it was the regular course of such business to make such writing or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. Such writing or record shall not be rendered inadmissible by (1) a party's failure to produce as witnesses the person or persons who made the writing or record, or who have personal knowledge of the act, transaction, occurrence or event recorded or (2) the party's failure to show that such persons are unavailable as witnesses. Either of such facts and all other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect the weight of such evidence, but not to affect its admissibility. Except as provided in chapter 3, if any person in the regular course of business has kept or recorded any memorandum, writing, entry, print, representation or combination thereof, of any act, transaction, occurrence or event, and in the regular course of business has

determine, before concluding that it is admissible, that the record was made in the regular course of business, that it was the regular course of such business to make such a record, and that it was made at the time of the act described in the report, or within a reasonable time thereafter. See generally *Hutchinson* v. *Plante,* 175 Conn. 1, 4, 392 A.2d 488 (1978); *Szela* v. *Johnson Motor Lines, Inc.,* 145 Conn. 714, 723, 146 A.2d 910 (1958). Once these criteria have been met by the party seeking to introduce the record, however, it does not necessarily follow that the record itself is generally admissible, nor does it mean that everything in it is required to be admitted into evidence. *Hutchinson* v. *Plante,* supra; *Mucci* v. *LeMonte,* 157 Conn. 566, 569, 254 A.2d 879 (1969); *Maggi* v. *Mendillo,* 147 Conn. 663, 667, 165 A.2d 603 (1960). For example, the information contained in the record must be relevant to the issues being tried. See *Maggi* v. *Mendillo,* supra. In addition, the information contained in the report must be based on the "entrant's own observation or on information of others whose business duty it was to transmit it to the entrant." *Mucci* v. *LeMonte,* supra. If the information does not have such a basis, it adds another level of hearsay to the report which

caused any or all of the same to be recorded, copied or reproduced by any photographic, photostatic, microfilm, microcard, miniature photographic or other process which accurately reproduces or forms a durable medium for so reproducing the original, the original may be destroyed in the regular course of business unless its preservation is otherwise required by statute. Such reproduction, when satisfactorily identified, shall be as admissible in evidence as the original in any judicial or administrative proceeding, whether the original is in existence or not, and an enlargement or facsimile of such reproduction shall be likewise admissible in evidence if the original reproduction is in existence and available for inspection under direction of court. The introduction of a reproduced record, enlargement or facsimile shall not preclude admission of the original. The term 'business' shall include business, profession, occupation and calling of every kind."

The format of the statute has now been revised. See Public Acts 1982, No. 82-160, § 84.

necessitates a separate exception to the hearsay rule in order to justify its admission. *Hutchinson* v. *Plante,* supra, 5.

With these general principles in mind, we now turn to the defendants' claims of error arising out of the introduction of the police reports. The defendants' first claim in this regard is that Emhart introduced only the copies of the reports and that, based on the testimony of Chief Patterson, through whom the reports were introduced, the court erred in concluding that a proper foundation for their admission had been established. Prior to the introduction of these reports, Chief Patterson testified that each report was "made in the ordinary course of business," that it was "the ordinary course of business to make such a document," and that it was in "the ordinary course of business to make such a document at or near the time of the event recorded." He also testified that the forms on which the reports are written have three attached pages so that for each report there is an original and two carbon copies. The original was kept in the records section of the police department, while the third copy of the three part set was the actual document that was admitted into evidence. Chief Patterson did not compare the copies of the police reports that were introduced with the original reports. He did testify, however, that he had had occasion to fill out such forms and that on those occasions the carbon copy had always accurately reflected the original document. He testified further that it was possible for the original to be amended after the copy had been detached, but that this was "unlikely" to happen without his having knowledge of it.

On the basis of the foregoing evidence, we must reject the defendants' claim that Emhart did not lay a proper foundation to introduce carbon copies of the police reports. General Statutes § 52-180 specifically

permits the introduction of copies provided the copies were made in the regular course of business and the process by which the copies were prepared accurately reproduced the original. Here, Chief Patterson testified that these documents were made in the regular course of business, that he had personally used such types of forms in filling out reports and that the copies had accurately reflected the original.[10] This testimony provided a sufficient basis for the trial court to conclude that the documents satisfied the criteria of General Statutes § 52-180. There is no requirement, as the defendants suggest, that the witness through whom the documents are admitted must have compared the copy with the original. Rather, it is evident from the statute that the legislature intended the issue of whether the copy accurately reflected the original to be resolved by the process by which the copy was made.[11] In fact, the statute permits the introduction of copies where the "original may be destroyed in the regular course of business." In many instances this would preclude a witness from comparing the original and the copy because, under the statute, the witness through whom the documents are introduced need not be the person who made the document. See *E. Paul Kovacs & Co.* v. *Alpert,* 180 Conn. 120, 127, 429 A.2d 829 (1980).

---

[10] The defendants have not claimed on appeal that Chief Patterson was not a qualified witness upon which the trial court could rely in determining that the copies were accurate. See *American Oil Co.* v. *Valenti,* 179 Conn. 349, 357–60, 426 A.2d 305 (1979).

[11] This is not to say that a comparison of the original and the copy cannot be utilized as an aid for determining whether to admit copies. For example, in this case, even though Chief Patterson testified as to the accuracy of the copies, if the defendants had requested to examine the originals and, after examination, they turned out to be different in some material aspect from the copies, the trial court could properly consider this factor in determining whether to admit the copies into evidence. If the court determined that the copies were admissible, this factor could still be utilized in determining how much weight to give to the copies.

Finally, we cannot find that the trial court erred in admitting the police reports because Chief Patterson testified that it was possible for an officer to change the original report without changing the copies. This statement must be considered in light of his entire testimony. First, he immediately qualified this statement by saying that it would be "unlikely" for this to happen without his having personal knowledge of it. He had previously been asked whether "sometimes the officer may type something on the original and then type other things on the second and third copy, is that correct?" to which he had replied, "[n]o." These qualifications, together with his testimony that, based upon his personal observation, the copies accurately reflected the original, form a sufficient basis upon which the trial court could find that the statutory criteria had been met. The trial court properly determined that any doubt about the accuracy of the reports in this situation would go to the weight to be afforded the documents, not to their admissibility. See *American Oil Co.* v. *Valenti,* 179 Conn. 349, 358, 426 A.2d 305 (1979).

The second claimed error raised by the defendants in regard to the police reports is not properly before this court. The defendants claim that Chief Patterson was able to identify only the signatures on the reports and not the printed handwritings. In addition, they point out that in one report it appeared that it was prepared by an officer other than the one who signed it, while Patterson testified that it was not the normal practice for officers to write each other's reports. According to the defendants, each of these factors raises a question as to whether the reports were based on personal observation. The problem with this claim, i.e., that the reports were not based on personal observation, is that the defendants never asserted this

specific objection in the trial court directed to this claimed deficiency. On appeal, this court will not review a claim, except in exceptional circumstances, where the claim raised on appeal is different from the objection raised in the trial court. *Cahill* v. *Board of Education,* 187 Conn. 94, 99, 444 A.2d 907 (1982); *Witek* v. *Southbury,* 132 Conn. 104, 110, 42 A.2d 843 (1945). No such exceptional circumstances have been put forth in this case.

The second set of documents which the defendants claim was inadmissible consists of "incident reports" prepared by employees of Burns Security. The defendants' first claim of error arising from their introduction is that the person through whom they were introduced, Ed Bradley, a field supervisor for Burns Security, could not testify as to how soon after the incident described in each report the actual reports were filled out. As noted previously, this is one of the requirements for admissibility pursuant to the statute. The defendants' claim, however, is without merit. Before each document was introduced, Bradley testified that the reports were made at or near the time of the incident reported therein. He also testified that the Burns employees submitted "this type of report" to him every day. On the basis of this testimony, the trial court could reasonably conclude that the statutory requirements had been satisfied.

We would note at this point that the inability of Bradley to testify as to the exact date and time when a report was filled out does not render the report inadmissible. We have held that the statute should be liberally interpreted. See *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* 154 Conn. 593, 597, 227 A.2d 548 (1967). In part, this is due to the fact that the statute recognizes that the trustworthiness of such documents comes from their being used for busi-

ness and not for litigation. See *American Oil Co.* v. *Valenti,* supra, 357; see generally *In re Estate of Indyk,* 488 Pa. 567, 413 A.2d 371 (1979). In light of this principle, if it can be demonstrated, as it was in this case, that it was the regular business practice to file reports within a reasonable time after the incident itself, this is sufficient to assure that the report was made at a time when the incident was fresh in the author's mind.

The defendants also claim that it is unclear whether the reports filed by the Burns Security employees were based upon personal observation. This claim is without merit. Although Bradley said that he could not testify that each report was based upon a guard's personal observation, his testimony indicated that it was their practice to base the reports on personal observation. He also testified that if someone approached a security guard and reported an incident outside of that guard's field of observation, this would not be written down in an incident report. This was because "[i]t would have to be investigated by the officer who was there, to the fact whether or not what [the person] was telling [the officer] was true." Absent some other evidence indicating that the reports were not based upon personal observation, Bradley's testimony was sufficient to meet the statutory requirement.

The defendants point to the fact that Bradley could only identify the signature on the reports, and not the handwriting in the report, as a factor negating a finding that they were based on personal observation. We disagree. First, there is absolutely no requirement in the statute that the witness through whom a report is admitted be able to identify the handwriting. In addition, the defendants have not set forth how this factor bears any relationship to the issue of whether the report was based upon personal observation. Finally, the defendants' claim would actually defeat the purpose

behind the rule. The reliability of business records arises, in part, from the fact that "[t]he habit and system of making such a record with regularity calls for accuracy through the interest and purpose of the entrant . . . ." 5 Wigmore, Evidence (Chadbourn Rev.) § 1522 (1). It has also aptly been noted that "[t]he complex nature of modern business organizations is such that all participants in the preparation of a record can most often not be identified . . . ." McCormick, Evidence (2d Ed.) § 312; see also *In re Estate of Indyk,* supra; *State* v. *Burclaff,* 138 Vt. 461, 466–67, 418 A.2d 38 (1980). Moreover, we have already noted that our statute should be liberally construed. *General Motors Acceptance Corporation* v. *Capitol Garage, Inc.,* supra. In view of the size and complexity of business today, it would be difficult to require a testifying witness to be able to identify, in all instances, a person's handwriting.

The defendants also claim that there is evidence that the security guards based their reports on what they saw on a television monitor and that this is further evidence that the reports were not based upon personal observation. The short answer to this claim is that this objection was never raised in the trial court. Therefore, we will not consider the issue. See *Roche* v. *Fairfield,* 186 Conn. 490, 505, 442 A.2d 911 (1982).

The defendants' final claim of error in regard to the incident reports is that they "invariably use the amorphous term 'strikers.' " They claim that unless the reports can be shown to relate to any of the defendants, they are irrelevant. Assuming arguendo that we agreed with this claim, the problem is that according to the memorandum of decision and the injunction that was issued, the trial court agreed with it. That is, nowhere in the memorandum of decision is reference made to any of the occurrences described in the incident reports

which were attributed solely to "strikers," except the blue Honda incident concerning which there was testimony not only from the driver of the blue Honda, but also from one of the pickets who was present. In view of the fact that these individual reports were not used as a basis for the trial court's decision, any error in admitting them was rendered harmless.

The final set of documents which the defendants claim were erroneously introduced consists of time cards of nonstriking employees indicating the time they lost from work due to strike delay, as well as a summary of the information in these cards. Our review of the evidence indicates that there was substantial evidence from the mouths of witnesses regarding the delays caused by the strike so that the evidence contained in the time cards can be considered cumulative. Even if we assume arguendo that the court did err in concluding that these documents satisfied the criteria of General Statutes § 52-180, any error was rendered harmless by the introduction of this direct evidence. Therefore, we do not address this issue. See *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 327, 430 A.2d 1 (1980); *State* v. *Boyd,* 178 Conn. 600, 604, 424 A.2d 279 (1979); *Guhring* v. *Gumpper,* 117 Conn. 548, 552, 169 A. 189 (1933).

## II

### PROPRIETY OF ISSUING THE INJUNCTION

We now turn to the issue of whether the trial court erred in concluding that Emhart had satisfied its burden pursuant to General Statutes §§ 31-114 and 31-115. We begin by noting the various constraints placed upon the judiciary by the statutes governing labor disputes, General Statutes §§ 31-112 through 31-121. The federal counterpart to these statutes, known as the Norris-LaGuardia Act; 29 U.S.C. §§ 101

through 115; has been interpreted as taking "federal courts out of the labor injunction business except in . . . very limited circumstances . . . ."[12] *Marine Cooks & Stewards, AFL* v. *Panama S. S. Co.,* 362 U.S. 365, 369, 80 S. Ct. 779, 4 L. Ed. 2d 797, reh. denied, 363 U.S. 809, 80 S. Ct. 1235, 4 L. Ed. 2d 1151 (1960); see also *Milk Wagon Drivers' Union, Local No. 753* v. *Lake Valley Farm Products, Inc.,* 311 U.S. 91, 102, 61 S. Ct. 122, 85 L. Ed. 63 (1940); *Cimarron Coal Corporation* v. *District No. 23, United Mine Workers,* 416 F.2d 844, 846–47 (6th Cir. 1969). Our statutes have been similarly interpreted. *Connecticut State Employees Assn.* v. *AFSCME,* 188 Conn. 196, 199, 448 A.2d 1341 (1982); *Anaconda Co.* v. *United Automobile Workers,* 34 Conn. Sup. 157, 159, 382 A.2d 544 (1977); see also *Schollhorn Co.* v. *Workers International Union,* 14 Conn. Sup. 22, 25 (1946). Limiting injunction jurisdiction serves the purpose of preventing federal "courts from upsetting the natural interplay of the competing economic forces of labor and capital." *Brotherhood of Railroad Trainmen* v. *Chicago R. & I. R. Co.,* 353 U.S. 30, 40, 77 S. Ct. 635, 1 L. Ed. 2d 622, reh. denied, 353 U.S. 948, 77 S. Ct. 823, 1 L. Ed. 2d 857 (1957); see *de Arroyo* v. *Sindicato de Trabajadores Packinghouse, AFL-CIO,* 425 F.2d 281, 291 (1st Cir.), cert. denied sub nom. *Puerto Rico Tele. Co.* v. *Figueroa de Arroyo,* 400 U.S. 877, 91 S. Ct. 117, 27 L. Ed. 2d 114 (1970), reh. denied, 401 U.S. 926, 91 S. Ct. 863, 27 L. Ed. 2d 831 (1971); see generally Wellington, Labor and the Legal Process 40 (1968). It is a thoroughly pragmatic and historical circumstance, recognized by judicial decisions

---

[12] We have stated that because our statutes are similar to the federal statute, the interpretation of the latter by the United States Supreme Court is deemed "particularly pertinent" in construing our own statute. *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 85, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972); see *Benoit* v. *Amalgamated Local 299,* 150 Conn. 266, 274, 188 A.2d 499 (1963).

that a strike "when legitimately employed is an economic weapon which in great measure implements and supports the principles of the collective bargaining system." *NLRB* v. *Erie Resistor Corporation,* 373 U.S. 221, 234, 83 S. Ct. 1139, 10 L. Ed. 2d 308 (1963); see *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U.S. 184, 209, 42 S. Ct. 72, 66 L. Ed. 189 (1921). State courts should also be mindful of unwarranted intrusions into labor disputes when issuing injunctions due to the doctrine of federal preemption. See *Sears, Roebuck & Co.* v. *San Diego County District Council of Carpenters,* 436 U.S. 180, 188, 98 S. Ct. 1745, 56 L. Ed. 2d 209 (1978); *San Diego Building Trades Council* v. *Garman,* 359 U.S. 236, 243–44, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959); *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 83–84, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972). Finally, it must be recognized "that peaceful picketing carried on in a location open generally to the public is, absent other factors involving the purpose or manner of the picketing, protected by the First Amendment." (Citations omitted.) *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U.S. 308, 313, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968); see generally *Paschen Contractors, Inc.* v. *Burrell,* 14 Ill. App. 3d 748, 303 N.E.2d 246 (1973); *Johnson Brothers Wholesale Liquor Co.* v. *United Farm Workers National Union, AFL-CIO,* 308 Minn. 87, 241 N.W.2d 292 (1976). While these principles do not act as a bar against the issuance of injunctions by state courts, they do establish a limiting framework within which a state court must exercise its discretion in any given case.

Before an injunction may issue, pursuant to General Statutes § 31-115, the trial court must find that the plaintiff has satisfied its burden of proving each of the

criteria provided therein. The plaintiff must establish "(a) [t]hat unlawful acts have been threatened and will be committed by a person or persons unless such person or persons are restrained therefrom, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act except against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; (b) that substantial and irreparable injury to the complainant or his property will follow; (c) that as to each item of relief granted greater injury would be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the granting of relief; (d) that the complainant has no adequate remedy at law; and (e) that the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection." We will discuss each of these elements in turn.

The defendants claim that the record is "embarrassingly barren" of credible evidence regarding any unlawful activity undertaken by the defendants. We disagree, as did the trial court, which was the arbiter of credibility. First, as indicated above, the record is replete with evidence that the picketers conducted their picket line in such a way as to block ingress to and egress from the plant. Numerous courts, including those in this jurisdiction, have held that "[i]nterference with a free right of ingress and egress to and from a plant by those who had such a right is unlawful. *American Steel Foundries* v. *Tri-City Central Trades Council,* 257 U.S. 184 [42 S. Ct. 72, 66 L. Ed. 189 (1921)]. Mass and circular picketing is in the same category. *Goldfinger* v. *Feintuch,* 276 N.Y. 281, 286 [11 N.E.2d 910 (1937)]." *Anaconda Co.* v. *United Automobile Workers,* supra,

165; see *Turner & Seymour Mfg. Co.* v. *Torrington Foundry Workers Local 1699,* 18 Conn. Sup. 73, 78 (1952); see also *International Molders & Allied Workers Union, AFL-CIO-CLC* v. *Aliceville Veneers Div., Buchanan Lumber Birmingham, Corporation,* 348 So. 2d 1385, 1390 (Ala. 1977); *Kaplan's Fruit & Produce Co.* v. *Superior Court of Los Angeles County,* 26 Cal. 3d 60, 77–78, 603 P.2d 1341 (1979); *General Electric Co.* v. *Local 997 United Automobile Workers of America,* 8 Ill. App. 2d 154, 163, 130 N.E.2d 758 (1955); *Reece Shirley & Ron's Inc.* v. *Retail Store Employees Union & Local 782,* 222 Kan. 373, 381–82, 565 P.2d 585 (1977); *Johnson Brothers Wholesale Liquor Co.* v. *United Farm Workers, National Union, ALF-CIO,* supra, 98, and cases cited; *Westinghouse Electric Corporation* v. *United Electrical, Radio & Machine Workers of America, Local No. 410,* 139 N.J. Eq. 97, 112–13, 49 A.2d 896 (1946); *PTA Sales, Inc.* v. *Retail Clerks Local No. 462,* 96 N.M. 581, 585, 633 P.2d 689 (1981); *Neshaminy Constructors, Inc.* v. *Philadelphia, Pennsylvania Building & Construction Trades Council, AFL-CIO,* 303 Pa. Super. 420, 424, 449 A.2d 1389 (1982) and cases cited; see generally Babcock, "Connecticut State Court Injunctions In Labor Disputes," 54 Conn. B.J. 37, 39–40 (1980); 51B C.J.S., Labor Relations § 816. The state interest justifying judicial action is Emhart's right to the reasonable use and free access to its property. In the present case, the striking employees effectively usurped Emhart's right to determine when the nonstriking employees would get into the plant to work. See *Westinghouse Electric Corporation* v. *United Electrical, Radio & Machine Workers of America, Local No. 410,* supra.

Furthermore, even though there was little actual physical violence, the conduct of the picket line in this case cannot be considered "peaceful." This court has

said, "[t]o intimidate is to inspire with fear, to overawe or make afraid. Fear may be inspired without physical violence or spoken threats, moral intimidation may be accomplished by a menacing attitude and a display of force which may coerce the will as effectually as actual physical violence. The gathering of strikers in considerable numbers at the entrance of a factory with threatening attitude toward employees, who must run the gauntlet of a hostile picket line in going to and from work, may overawe and make them afraid by a show of force which itself is intimidating. The well considered authorities all hold that the conduct of a strike may be such as to constitute intimidation though there is no use of force or physical violence." *Levy & Devaney, Inc.* v. *International Pocketbook Workers Union,* 114 Conn. 319, 322, 158 A. 795 (1932); see also *Anaconda Co.* v. *United Automobile Workers,* supra, 164–65; cf. *Youngdahl* v. *Rainfair, Inc.,* 355 U.S. 131, 138–39, 78 S. Ct. 206, 2 L. Ed. 2d 151 (1957); *Smitty's Super Markets, Inc.* v. *Retail Store Employees Local 322,* 637 S.W.2d 148, 155 (Mo. Ct. App. 1982). Concededly, the "spoken threats" and "moral intimidation" must be of such a nature so that the picketers' first amendment rights will not be infringed by any court action. In the present case, however, the actions of the picketers went beyond that protected level. There was substantial evidence of cars being stopped by groups of picketers numbering ten to thirty people. As the nonstriking employees waited for the picketers' permission to enter, a function we have already noted the picketers impermissibly usurped, they were, as the trial court stated, "subjected to threats, jeers and so forth."[13] The trial court concluded that "[p]hysical violence and prop-

---

[13] There was also testimony that license plate numbers of nonstriking employees were being reported. See *United Aircraft Corporation* v. *International Assn. of Machinists,* 161 Conn. 79, 93, 95, 285 A.2d 330 (1971), cert. denied, 404 U.S. 1016, 92 S. Ct. 675, 30 L. Ed. 2d 663 (1972).

erty damage was feared." A similar conclusion was reached by the United States Supreme Court in *Youngdahl* v. *Rainfair, Inc.,* supra: "When, in a small community, more than 30 people get together . . . and heap abuse on their neighbors and former friends, a court is justified in finding that violence is imminent." Id., 138–39. There was also evidence that the picketers and, in particular, the union leaders acted belligerently towards the police and deliberately refused to comply with their requests regarding the conduct of the picket line. When all these facts are considered together, we cannot find that the trial court was clearly erroneous in determining that unlawful acts had been committed.

To justify the issuance of an injunction against individual defendants and/or a union pursuant to General Statutes §§ 31-115 (a) and 31-114, however, it is not enough that unlawful acts be committed by picketers who happen to be union members. "[N]o injunction . . . shall be issued on account of any threat or unlawful act except against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof . . . ." General Statutes § 31-115 (a). General Statutes § 31-114 places even more stringent limits on a trial court before a finding of "vicarious" responsibility or liability would be justified. "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court for the unlawful acts of individual officers, members or agents, except upon proof of actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof." The parameters of what constitutes "actual" participation, authorization or ratification have been discussed at

length in two of our cases. *United Aircraft Corpora-
tion* v. *International Assn. of Machinists,* supra; *Benoit*
v. *Amalgamated Local 299,* 150 Conn. 266, 188 A.2d
499 (1963). Both cases impliedly adopted the view first
espoused by the United States Supreme Court in
*United Brotherhood of Carpenters & Joiners of America*
v. *United States,* 330 U.S. 395, 403, 67 S. Ct. 775, 91
L. Ed. 973 (1947), that responsibility for unlawful activ-
ity must be established by "clear proof."[14] Federal
courts applying the counterpart to our statute have said
that "[t]he statutory requirement of 'clear proof' lies
somewhere between the traditional burdens of reason-
able doubt and preponderance of the evidence. [*United
Mine Workers of America* v. *Gibbs,* 383 U.S. 715, 737,
86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966)]." *Kayser-Roth
Corporation* v. *Textile Workers Union of America,
AFL-CIO,* 479 F.2d 524, 526 (6th Cir.), cert. denied,
414 U.S. 976, 94 S. Ct. 292, 38 L. Ed. 2d 219 (1973);
see *Dacey* v. *Connecticut Bar Assn.,* 170 Conn. 520, 537,
368 A.2d 125 (1976). Both *United Aircraft* and *Benoit*
also adopted the view that more than a showing
of common law agency was required in order to estab-
lish that an officer of the union actually participated
in, authorized or ratified unlawful activity. *United
Aircraft Corporation* v. *International Assn. of
Machinists,* supra, 86–87; *Benoit* v. *Amalgamated Local*

[14] The defendants claim that the burden of "clear proof" also applies when
proving that unlawful acts were committed. None of the cases cited by the
defendants extends this burden beyond the area of proving union respon-
sibility. In fact, in *Ramsey* v. *United Mine Workers of America,* 401 U.S.
302, 91 S. Ct. 658, 28 L. Ed. 2d 64 (1971), the Supreme Court explicitly
held that under the federal counterpart to General Statutes § 31-114; see
*Benoit* v. *Amalgamated Local 299,* 150 Conn. 266, 188 A.2d 499 (1963); the
clear and convincing standard was only required "as to the Union's authori-
zation, participation in, or ratification of the acts allegedly performed on
its behalf." Id., 311; see also *Harlem River Consumers Coop., Inc.* v.
*Associated Grocers,* 450 F.2d 271, 273 (2d Cir. 1971). We believe that unions
and individual officers will be sufficiently protected by limiting this higher
burden of proof to this element.

*299,* supra, 274. As stated in *United Aircraft Corporation* v. *International Assn. of Machinists,* supra: "We conclude that, in requiring *actual* authorization in order to impose liability, it is the intent expressed in § 31-114 to require more than the agency rules of respondeat superior and more than the general authority with which an officer of the organization is clothed by virtue of his office. We subscribe to the proposition that the statute requires proof by the plaintiff that the acts complained of were either expressly authorized by the organization to be charged or were such that they flowed from that authorization. . . . When we come to the element of participation, we conclude that if representatives of the organization to be charged are proved to have actually taken part in the illegal acts complained of then the organization can be held liable for those acts depending upon the number and status of the persons participating and the extent of the organization's knowledge of and power to control their actions. In applying this rule, care must be taken in cases such as those before us to treat the individuals involved in their proper relationship." (Emphasis in original.) Id., 88-89. Finally, it should be noted that while the purpose of these statutes is to protect unions and their officers from liability, it is still true, and we have earlier held, that a union acts through the instrumentalities of individuals. *Benoit* v. *Amalgamated Local 299,* supra, 273. "Certainly an association or organization cannot escape responsibility by standing orders disavowing authority on the part of its officers to make any agreements in violation of the Sherman Act and disclaiming union responsibility for such agreements. Facile arrangements do not create immunity from the act, whether they are made by employee or by employer groups." *United Brotherhood of Carpenters & Joiners of America* v. *United States,* supra, 409.

With these principles in mind, there can be no doubt that the individual defendants and the union actually participated in or authorized the picketing which we have previously concluded was unlawful. All six of the individual defendants were seen at various times at the picket line, with four of them either leading the picketers or walking in the line. The "number and status" of these six individuals were enough to hold the union responsible: one was the union president; two were business agents; two were designated as "picket captains" by the president; and one was shop chairman. Furthermore, Wheeler, the union president, testified that the rotational picketing used was the union's normal procedure. In *United Brotherhood of Carpenters & Joiners of America,* the United States Supreme Court also said: "And the custom or traditional practice of a particular union can also be a source of actual authorization of an officer to act for and bind the union." *United Brotherhood of Carpenters & Joiners of America* v. *United States,* supra, 410. While each case calls for an individual examination of the union hierarchy, under the circumstances of this case there was clear proof upon which the trial court could enjoin the defendant union.

There was also clear proof that the individual defendants and the union participated in or authorized the verbal harassment and intimidation of the nonstriking employees which led to a situation in which physical violence and property damage was feared. As noted previously, all six defendants were at the picket line at various times while this was going on. Wheeler, himself, was described as being belligerent to a police lieutenant, as was Velez. Velez, Bower and Madore were all arrested for disobeying direct police orders. Another police report indicated that the "labor leaders" aggravated the situation on one occasion by inform-

ing the picketers that they "could legally continue being verbally abusive."[15] Finally, at one point when a nonstriking employee's car was surrounded and was being attacked, Wheeler took no action to restrain the picketers; rather, he started yelling at the guard inside the gate. When a person in such a position remains effectively silent in the face of such activity, it clearly can be considered a relevant factor in determining the element of participation or authorization.[16] Considering this evidence as a whole, we conclude that the trial court was justified in finding clear proof that the defendants either participated in or authorized the harassment and intimidation, or that such actions "flowed" from that participation and/or authorization. *United Aircraft Corporation* v. *International Assn. of Machinists,* supra, 88. To hold otherwise would permit a "facile arrangement" of union leaders appearing to stand apart to create immunity from the act; a consequence not intended by the use of the term "actual" participation or authorization. See *United Brotherhood of Carpenters & Joiners of America* v. *United States,* supra; cf. *James-R. Snyder Co.* v. *Edward Rose & Sons, Inc.,* 546 F.2d 206, 209 (6th Cir. 1976); *Harlem River Consumers Coop., Inc.* v. *Associated Grocers,* 450 F.2d 271, 273-74 (2d Cir. 1971); *White Oak Coal Co.* v. *United Mine Workers of America,* 318 F.2d 591, 598 (6th Cir. 1963). Although there must be clear proof of

---

[15] As noted previously, we agree with the defendants that a trial court should view with skepticism a report attributing such a broad claim to an indefinite group of people such as "labor leaders," especially where the officer who wrote the report is not in court to testify. The report, however, was admissible and, under the circumstances of this case in which it was consistent with other evidence, it could be given credence by the trial court.

[16] In contrast, where a union officer does take some action to restrain the picketers but is unsuccessful in his efforts, this should not be relied upon as a factor demonstrating union participation or authorization. It should be the policy of our courts to encourage all reasonable efforts in ensuring labor peace.

authorization or participation, such proof may be circumstantial. See *James R. Snyder Co.* v. *Edward Rose & Sons, Inc.,* supra.

The next two elements that we will consider which Emhart was required to prove under the statute were that it suffered substantial and irreparable injury to its business or property and that it did not have an adequate remedy at law. General Statutes § 31-115 (b) and (d). The trial court concluded that the effect of the defendants' actions on Emhart and its employees "cannot but result in substantial and irreparable injury to [Emhart], over and above and separate from the economic effect of the strike." We agree with the court's conclusion that there was no adequate remedy at law because only the issuance of an injunction could prevent the continuing injury. In this regard we have noted that "[a]n injunction is granted with reference to what there is reason to expect in its absence." *Levy & Devaney, Inc.* v. *International Pocketbook Workers Union,* 114 Conn. 319, 324, 158 A. 795 (1932).

" 'Whether damages are to be viewed by a court of equity as "irreparable" or not depends more upon the nature of the right which is injuriously affected than upon the pecuniary measure of the loss suffered.' " *Hammerberg* v. *Leinert,* 132 Conn. 596, 602, 46 A.2d 420 (1946), quoting *Robertson* v. *Lewie,* 77 Conn. 345, 346, 59 A. 409 (1904); see also *Berin* v. *Olson,* 183 Conn. 337, 341, 439 A.2d 357 (1981); *Connecticut Assn. of Clinical Laboratories* v. *Connecticut Blue Cross, Inc.,* 31 Conn. Sup. 110, 114, 324 A.2d 288 (1973); *Turner & Seymour Mfg. Co.* v. *Torrington Foundry Workers Local 1699,* 18 Conn. Sup. 73, 79 (1952). In the present case, one right that is being substantially impaired is Emhart's right to the free access and use of its prop-

erty and business.[17] This loss was ongoing and, as such, met the requirement of being imminent; see *Karls* v. *Alexandra Realty Corporation,* 179 Conn. 390, 402, 426 A.2d 784 (1980); and would not be regained without the issuance of an injunction. Under similar circumstances courts have found that this is an appropriate situation for the issuance of an injunction. See *Old Ben Coal Corporation* v. *Local Union No. 1487 of United Mine Workers of America,* 500 F.2d 950, 953 (7th Cir. 1974); *Anaconda Co.* v. *United Automobile Workers,* 34 Conn. Sup. 157, 165, 382 A.2d 544 (1977); *Kaplan's Fruit & Produce Co.* v. *Superior Court of Los Angeles County,* 26 Cal. 3d 60, 80–81, 603 P.2d 1341 (1979).

The next element that must be considered is whether "as to each item of relief granted greater injury would be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the granting of relief . . . ." General Statutes § 31-115 (c). The statute, in essence, contemplates a weighing of the equities in each case, a process which the trial court's memorandum indicates it undertook in this case. See generally *DeCecco* v. *Beach,* 174 Conn. 29, 35, 381 A.2d 543 (1977). The injunction issued by the trial court did not prohibit all picketing. Rather, it was limited to prohibiting that picketing and/or violence which would interfere with the use of Emhart's property, activity which we have held unlawful. Therefore, weighing the substantial harm to Emhart with the fact that only

---

[17] The defendants claim that any loss of access was due, in large part, to the actions of Emhart officials in closing three of the four entrances. We disagree. Emhart has the right to make reasonable use of its property, and in this case we have indicated that there was testimony that the decision to close the other gates was made after consultation with Chief Patterson who stated that it would be easier to ensure the safety of all concerned if only the one gate was opened. In these circumstances, we cannot conclude that the delays due to lack of access were self-inflicted.

unlawful activity is being restrained, we cannot conclude that the trial court erred in finding that Emhart satisfied this element of the statute.

The final element under the statute that must be proven before an injunction may be issued is whether "the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection." General Statutes § 31-115 (e). The trial court found that the Windsor police force could not "continue to place the necessary personnel at the site of the picketing and ignore their duty to the whole community . . . ." In their brief, the defendants challenge this finding by citing evidence which the trial court "apparently ignored." This argument, however, ignores the limited nature of our review. "Where there is conflicting evidence, as claimed by the defendants, we do not retry the facts or pass upon the credibility of the witnesses. The trial court determines the credibility of witnesses; *Faiola* v. *Faiola,* 156 Conn. 12, 15, 238 A.2d 405 [1968]; *Romaniello* v. *Dyna Distributors, Inc.,* 154 Conn. 605, 606, 227 A.2d 430 [1967]; and the weight of the evidence is not determined by the number of witnesses for or against any one proposition. *Cooke* v. *United Aircraft Corporation,* 152 Conn. 214, 218, 205 A.2d 484 [1964]. Where the evidence, as here, is in conflict, its probative force is for the trier. *Parish of St. Andrew's Church* v. *Zoning Board of Appeals,* 155 Conn. 350, 359, 232 A.2d 916 [1967]." *Robert Lawrence Associates, Inc.* v. *Del Vecchio,* 178 Conn. 1, 14, 420 A.2d 1142 (1979).

The exact circumstances warranting a finding that the public officials were "unwilling or unable" to furnish adequate protection cannot be established in a single case. Rather, it should be a finding left to the discretion of the trial court in each instance. Certainly, there must be more than a "pro forma" request by an

employer to the police for aid. See *Cimarron Coal Corporation* v. *District No. 23, United Mine Workers,* 416 F.2d 844, 846 (6th Cir. 1969). In addition, we would agree that, absent any other factors, if it was demonstrated that "the police authorities are maintaining at *all* times at [the] plant a force of officers sufficient to preserve order, to protect the property, and to allow all persons who wish to enter or leave to do so without physical interference, [there would be insufficient evidence to] make the necessary finding that those authorities are unable or unwilling to furnish adequate protection." (Emphasis added.) *Heinz Mfg. Co.* v. *United Auto Workers,* 20 F. Sup. 116, 117 (E.D. Pa. 1937); see generally *Donnelly Garment Co.* v. *Dubinsky,* 154 F.2d 38, 42–43 (8th Cir. 1946); 51B C.J.S., Labor Relations § 858. We are not faced with this type of situation, however.

On the basis of what transpired from Monday, September 13, 1982, through Thursday, September 16, 1982, we could not say the Windsor police were "unwilling or unable" to furnish adequate protection. Although Chief Patterson and Lieutenant Riccio were rebuffed by Wheeler when they attempted to talk to him about the picketing procedure on the day that it commenced, there was no evidence that the police either commanded the picketers to alter their procedure or that they took any action to compel the picketers to change. This evidence would have been relevant in establishing that the police were "unable" to act. In addition, there was no evidence that the police refrained from taking action in order to ensure that the situation remained under control. This type of evidence would have been relevant in determining whether the police were "unwilling" adequately to protect, and to provide reasonable access to, Emhart's property.

The situation changed, however, on Friday, September 17, 1982. From that day onward, Chief Patterson assigned an extra contingent of officers every morning and evening to open up the picket line. We have already noted the picketers' initial resistance to this procedure, and we also noted that as soon as the police left their positions, the picketers returned to their rotational picketing which obstructed access to and from the plant. On the basis of this evidence, the trial court could reasonably conclude that these extra officers would be necessary every day, and not only at peak rush hours, in order to assure free access to the plant. We have also set out Chief Patterson's testimony as to the effects on his force of continuing to assign extra officers to Emhart; officers were being pulled from other assignments; criminal investigations were not being followed up; and other traffic posts were not being manned. Even if we were to conclude that the police had the situation under control, we do not believe that the intent of the statute in using the terms "unwilling or unable," was to require public officials to commit so much of their resources to one facility that the rest of a town would be left without adequate police service.

We conclude that the trial court could have reasonably found that Emhart satisfied its burden of establishing each of the elements set forth in General Statutes §§ 31-114 and 31-115. Even when these criteria have been met, the issuance of an injunction still lies within the discretion of the trial court. *Hartford* v. *American Arbitration Assn.*, 174 Conn. 472, 477, 391 A.2d 137 (1978); see *Moore* v. *Serafin*, 163 Conn. 1, 6, 301 A.2d 238 (1972). Once the criteria have been met, however, our review is limited to whether the trial court abused its discretion. See *H. O. Canfield*

Co. v. *United Construction Workers,* 136 Conn. 293, 299, 70 A.2d 547 (1949). We cannot so conclude in this case.

## III

### SCOPE OF THE INJUNCTION

The final issue to be addressed is the scope of the injunction. The defendants claim that the injunction is invalid because it is both overly broad and vague. Except for the final paragraph of the injunction, we do not agree with the defendants.

"The scope of a temporary injunction will depend on the nature of the case, the evidence presented in the hearing and the relief sought." *Eads Coal Co.* v. *United Mine Workers of America, District No. 12,* 131 Ill. App. 2d 1082, 1086, 269 N.E.2d 359 (1971); see *Berin* v. *Olson,* 183 Conn. 337, 343, 439 A.2d 357 (1981); *Dupuis* v. *Submarine Base Credit Union, Inc.,* 170 Conn. 344, 356, 365 A.2d 1093 (1976); see generally *Old Ben Coal Corporation* v. *Local Union No. 1487 of United Mine Workers of America,* 500 F.2d 950, 953 (7th Cir. 1974). In addition, an injunction prohibiting picketing must be limited so that it does not infringe a defendant's first amendment rights. See *Amalgamated Food Employees Union Local 590* v. *Logan Valley Plaza, Inc.,* 391 U.S. 308, 313–14, 88 S. Ct. 1601, 20 L. Ed. 2d 603 (1968); *Thornhill* v. *Alabama,* 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940).

In the present case, the unlawful conduct being enjoined was the congregating and picketing in such fashion so as to impede ingress to and egress from the plant, and the use of harassment and intimidation so as to cause fear of physical injury to both person and property. Our review of the injunction indicates that this conduct is all that is being enjoined—not lawful con-

duct which would be constitutionally protected. Paragraph A enjoins congregating and picketing which blocks or interferes with entry into the plant. Paragraph B enjoins the use of force or threat of force so as to impede access. Paragraph C limits the number of picketers that are to remain at the entrances. We believe that this is a reasonable limitation where the trial court concludes that the number of picketers has contributed to the situation giving rise to the threat of violence and blocking access to a plant. *Kay-Fries, Inc.* v. *Martino,* 73 App. Div. 2d 342, 352, 426 N.Y.S.2d 304 (1980); see also *PTA Sales, Inc.* v. *Retail Clerks Local No. 462,* 76 N.M. 581, 585, 633 P.2d 689 (1981); cf. *Johnson Brothers Wholesale Liquor Co.* v. *United Farm Workers National Union, AFL-CIO,* 308 Minn. 87, 241 N.W.2d 292 (1976). Paragraph D enjoins the picketers from the use of threats or intimidation in conducting their strike.

The final paragraph of the injunction prohibits the defendants from "[i]nterfering in any unlawful way with the operation of plaintiff's business." The court was obviously motivated by a concern for Emhart's business based upon the actions of the defendants. Furthermore, Emhart had included such a request for relief in their complaint. This paragraph, however, is not limited in any manner to the issues that arose during the hearing or that were mentioned in the memorandum of decision. Relying on paragraph E, the defendants could be found in violation of the court's order for activity completely unrelated to the picketing or any violence, or threat of violence, engendered by the defendants' conduct. We conclude, therefore, that this particular paragraph was impermissibly broad and must be stricken.

In determining whether an injunction is void for vagueness, the court in *United States* v. *Professional*

*Air Traffic Controllers,* 678 F.2d 1, 3 (1st Cir. 1982), stated: "The 'void for vagueness' doctrine is a procedural due process concept which requires the giving of appropriate notice of a proscription before a person can be held accountable for its violation. Thus, a government regulation can neither forbid nor require 'the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application . . . .' *Connally* v. *General Construction Co.,* 269 U.S. 385, 391, 46 S. Ct. 126, 127, 70 L. Ed. 322 (1926)."

The injunction issued in this case, without considering paragraph E, clearly satisfies this test. The defendants first challenge paragraph A of the injunction which prohibits: "A. Congregating in mass and engaging in mass picketing, or otherwise in close formation around the entrance or leading to the entrance of plaintiff's premises at Day Hill Road, Windsor, Connecticut, in such a way as to block said entrance and prevent, interfere with or impede entrance into or egress from said premises or streets leading to said premises by plaintiff's officers and employees, members of the public and persons doing business with the plaintiff who may wish to enter or leave." The defendants claim that the use of the words "interfere with or impede" entrance into or egress from said premises is too vague because "[t]aken literally, this language forbids all picketing and concerted activity because picketing, by its nature, will impede ingress and egress." The problem with the defendants' argument is that by lifting four words out of the whole paragraph, they do not actually represent what, in fact, it enjoins. For example, under the defendants' argument, if a small group of picketers is standing near the entrance to the plant, without blocking it in any way, and a nonstriking employee or other person having business with Emhart

drives up to the plant, sees the pickets and decides not to enter, the picketers could be held in contempt for "interfering with or impeding" access to the plant. Clearly, however, this situation is not covered by the injunction because there are two conditions that have not been met. First, the picketers have not been shown to be "[c]ongregating in mass and engaging in mass picketing, or otherwise in close formation . . . ." Secondly, the picketers have not been shown to be acting "around the entrance or leading to the entrance [of the plant] in such a way as to block said entrance . . . ." With these two conditions, the injunction prohibits only what we have found to be unlawful conduct. Rather than being vague, it is, in fact, quite explicit.

The defendants' objection to paragraph B of the injunction suffers from the same fault as their first objection. That paragraph enjoins the following conduct: "B. By force, violence or intimidation, or threat of force or violence, or by the use of offensive language or gestures, impeding or interfering with plaintiff's officers or employees, persons doing business with the plaintiff or members of the public who may wish to enter or leave the plaintiff's premises." The defendants claim that the words "by the use of offensive language or gestures" are vague because "what is offensive to one person may not be to . . . anyone else." Thus, they claim, the injunction does not put them on notice of what conduct will subject them to contempt proceedings.

In support of their argument, the defendants cite *State* v. *Anonymous (1977-6)*, 34 Conn. Sup. 575, 377 A.2d 1342 (1976). This case, however, actually undermines the defendants' argument. The court there reversed a conviction for the use of an offensive gesture under a statute prohibiting "abusive or obscene

language or [making] an obscene gesture." General Statutes § 53a-181. The court did not hold the statute unconstitutional because it was vague. In fact, it specifically stated that the "expression directed against a particular individual or group . . . might be beyond the pale of constitutionally protected speech." *State* v. *Anonymous (1977-6),* supra, 577, citing *Chaplinsky* v. *New Hampshire,* 315 U.S. 568, 571–72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942).

In the present case, the use of the words "offensive language or gestures" cannot be considered in a vacuum. They are qualified inasmuch as their use must interfere or impede people from entering or leaving Emhart's plants. This language is somewhat similar to the statutory language which the Supreme Court upheld in *Chaplinsky* v. *New Hampshire,* supra, 569. The test which the state court applied in that case, and which was favorably cited by the Supreme Court is similar to the test set forth in *United States* v. *Professional Air Traffic Controllers,* supra. That is, the language and/or gestures must be such that an individual of common intelligence would feel threatened. The same test would control the injunction issued in this case. To require a trial court to delineate specifically each word or gesture which would be found offensive as well as the exact nature of what would constitute an interference with a person's doing business with Emhart would be impossible. On the other hand, the injunction cannot be interpreted so that the words are subject to the whim of any particular judge. Rather, what is prohibited is that conduct or language which would cause a reasonable individual to be threatened or feel threatened to such an extent that it would interfere with that individual's doing business with

Emhart. With this limitation, therefore, we cannot conclude that this paragraph is unconstitutionally vague.[18]

In conclusion, we hold that Emhart satisfied its burden in proving each of the criteria provided for in General Statutes §§ 31-114 and 31-115. Having satisfied this burden, the trial court was well within its discretion to issue an injunction. The entire injunction itself was properly entered except for paragraph E which we find to be overly broad. Therefore, there is no error in the judgment except for paragraph E of the injunction.

There is error in part, the judgment is set aside and the case is remanded with direction to render judgment as on file except that paragraph E of the injunction must be stricken.

In this opinion the other judges concurred.

---

[18] The defendants' final challenge to paragraph C of the injunction is not at all related to its being vague and will not be considered to any greater extent than we have already done.