[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION AND FINDING OF FACTS RE: PLAINTIFF'S APPLICATION FOR A TEMPORARY INJUNCTION
The plaintiff American Ref-Fuel Company of Southeastern Connecticut (American Ref-Fuel) brought this action for a temporary injunction and other relief against the defendants United Association of Plumbers and Steamfitters Local 305 (Steamfitters Local 305 or the union), International Brotherhood of Electric Works Local 35 (IBEW), Sprinkler Fitters Union Local 676 (Local 676), New London-Norwich Builders and Construction Trades Council (Building Trades Council), Cameron Champlin, Jr. (Champlin) individually and in his capacity as Business Manager of defendant Steamfitters Local 305 and John Doe and Mary Roe, claiming unlawful picketing on the plaintiff's premises in connection with a CT Page 6266 labor dispute. The plaintiff also, as part of the relief claimed, sought a temporary restraining order pursuant to General Statutes section 31-115, and after hearing thereon on March 26, 1991, its application was denied (Leuba, J.). The plaintiff's application for a temporary injunction was then heard by this court on various days during the period beginning April 2, 1991 and concluding May 16, 1991, and post trial briefs were filed.
During the course of the proceedings the plaintiff withdrew its action as to the defendants IBEW; Mary Roe and John Doe, and Local 676, and the court dismissed the case as to the defendant Building Trades Council for failure of the plaintiff to make out a prima facie case. The case was also dismissed by agreement of the parties as to the defendant Champlin, in his individual capacity, without prejudice, leaving Steamfitters Local 305 and Champlin (in his capacity as Business Manager) as the only remaining defendants.
 I
The court finds the facts set forth in Part I of this memorandum together with other acts that are incorporated in subsequent parts of this decision.
The plaintiff leases and occupies premises located on Route 12, Preston, Connecticut, on which it is building a trash-energy incinerator. Defendants Steamfitters Local 305 and Champlin set up an "informational" picket line at the entrance to plaintiff's job site on March 25, 1991. The defendants' dispute was not directly with the plaintiff but with one of the plaintiff's contractors at the site, Abington Construction Company, Inc. (Abington), and the parties stipulated in open court that the controversy involved in this proceeding was a "labor dispute" within the meaning of General Statutes section31-112.
The plaintiff, learning of the impending picketing, had previously modified its single gate means of entry and exit to its premises to create two gates. One gate (Gate 1) was to be used by its union contractors and their employees, which constituted the majority of the persons entering and leaving the site. The other gate (Gate 2) was to be used for Abington, certain other contractors, their employees and limited others.
When the picketing began, well over one hundred individuals were present. The picketing was conducted in a "rotational manner", that is the picketers would walk in front of the plaintiff's gates, and in front of vehicles attempting to enter or leave, in a circle. Generally, at the completion of CT Page 6267 one circle or `rotation', and sometimes two, the line would break, or be broken by police, and vehicles would be allowed to cross the line to gain entry or exit. This manner of picketing would result in impeding and delaying such vehicles for times of almost two minutes. The video tapes placed into evidence by the plaintiff clearly showed that numerous vehicles were so delayed. In fact, they also showed that picketers deliberately slowed their pace when blocking vehicles, and also reformed their lines and changed direction to further the delay in such vehicles' progress.
On many occasions vehicles were forced to skirt the picket line by driving off the paved driveway onto a slope or berm in order to gain entry or exit. State police were in attendance daily but seemingly only cleared way through the picket line for entering vehicles when traffic started to back up on Route 12.
The evidence also showed that the picketers, in the conduct of the line, were verbally abusive, used profanities and obscenities, spat at people and on their vehicles, and made threats directed to those attempting to cross it. On occasion, some picketers also pounded on such vehicles with their fists and threw rocks. In a few cases, there were some physical altercations, and confrontations with picketers pulling one person from his vehicle, and there were a few arrests. Also, on one day a picketer appeared to be photographing vehicles leaving the premises, and there was evidence that on one day a Union member was seen strewing nails and screws on a driveway area; there was also evidence that nails and screws were found in the driveway on other days, but no evidence as to who placed them there.
Due to the press of other court business the hearings had to be recessed for a time, and the court obtained an agreement from the parties as to the defendants' conduct of the picket line and as to the plaintiff's instructions to its contractors with respect to crossing the picket line. Despite this agreement, sporadic acts of unlawful conduct continued, and entering and exiting vehicles continued to be delayed, but to nowhere near the initial delays.
 II
As the plaintiff has sought relief from the court in the context of a labor dispute, the limitations in General Statutes sections 31-112 through 31-121 control this case. The statutory scheme has been interpreted by our Supreme Court ". . .as taking the. . . courts out of the labor injunction business except in. . . very limited circumstances. . .". Emhart CT Page 6268 Industries, Inc. v. Amalgamated Local Union 376, U.A.W.,190 Conn. 371, 392 (1983). The court went on to describe some of the principles which must guide a trial court: "Limiting injunction jurisdiction serves the purpose of preventing federal courts from upsetting the natural interplay of the competing economic forces of labor and capital.[1]" (Citation omitted). State courts should also be mindful of unwarranted intrusions into labor disputes when issuing injunctions due to the doctrine of federal preemption. (Citations omitted). ". . .It must be recognized that peaceful picketing carried on in a location open generally to the public is, absent other factors involving the purpose or manner of the picketing, protected by the First Amendment"'. Emhart, supra. 392-393 (Citations omitted).
For the plaintiff to prevail upon its claim for a temporary injunction therefore, it must prove each of the elements set forth in General Statutes section 31-115, which provides in pertinent part:
 ". . .(a) That unlawful acts have been threatened and will be committed by a person or persons unless such person or persons are restrained therefrom, but no injunction or temporary restraining order shall be issued on account of any threat or unlawful act except against the person or persons, association or organization making the threat or committing the unlawful act or actually authorizing or ratifying the same after actual knowledge thereof; (b) that substantial and irreparable injury to the complainant or his property will follow; (c) that as to each item of relief granted greater injury would be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the granting of relief; (d) that the complainant has no adequate remedy at law; and (e) that the public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection."
It should also be pointed out that even when all of these elements have been proven and satisfied, whether or not to grant an injunction is still within the court's discretion.
III CT Page 6269
The court will now measure the evidence against the requirements of each statutory element. The court has heard numerous witnesses, received documentary evidence, and observed (and heard in some cases) video tapes of the events occurring on and near the plaintiff's driveways leading to Gate 2. As a result of the plaintiff's gate entry/exit alteration, it should be noted that the vast majority of the complained of acts took place in front of Gate 2 which was used by Abington and others.
During the first week, the picket line was conducted so that vehicles entering or exiting the site at the beginning and end of the day shift were blocked and delayed. At this time, there were over one hundred picketers involved. As time passed, the number of picketers involved. As reduced, generally to about20-25 later after an agreement obtained by the court to between 3 and 8, as of May 16, 1991. Initially, almost all vehicles were delayed entry or exit for periods of 10-15 seconds to almost two minutes. As time wore on, the number of vehicles being delayed declined, but delays continued throughout the picketing.
As the Emhart court said, "Numerous courts, including those in this jurisdiction, have held that n(i)nterference with a free right of ingress and egress to and from a plant by those who had such a right is unlawful". Supra, 395. The picketing, in a manner which blocked and delayed vehicles entering or exiting the job site, was clearly unlawful.
So also were the verbal threats and abuse, jeers, obscenities, rock throwing, spitting, pounding on vehicles, photographing, and the nail and screw scattering on the driveway areas which the people crossing the picket line were subjected to. Even though as in Emhart, there were a few isolated acts of physical violence directed to line crossers; the conduct of this picket line can hardly be considered peaceful. These acts taken together, on the whole, clearly created fear, apprehension and intimidation on the part of those subjected to them. Moreover, the spoken jeers, threats, obscenities and the like, when associated with the large number of picketers and the physical acts, went far beyond what is permitted by the picketers' first amendment rights.
"To justify the issuance of an injunction against individual defendants and/or a union pursuant to General Statutes sections 31-115 (a) and 31-114, however, it is not enough that unlawful acts be committed by picketers who happen to be union members." Emhart, supra. 397. There must be proof of actual participation in, or actual authorization of, such acts, or ratification of such acts after actual knowledge thereof. Moreover, that responsibility for such unlawful acts must be established by clear proof, a CT Page 6270 burden somewhere between the traditional burdens of beyond a reasonable doubt and the preponderance of the evidence. A showing of common law agency is insufficient. As stated in Emhart, supra:
 "We subscribe to the proposition that the statute requires proof by the plaintiff that the acts complained of were either expressly authorized by the organization to be charged or were such that they flowed from that authorization. . . When we come to the element of participation, we conclude that if representatives of the organization to be charged are proved to have actually taken part in the illegal acts complained of then the organization can be held liable for those acts depending upon the number and status of persons participating and the extent of the organization's knowledge of and power to control their actions. In applying this rule, care must been taken in cases such as those before us to treat the individuals involved in their proper relationship. Finally, it should be noted that while the purpose of these statutes is to protect unions and their officers from liability, it is still true, and we have earlier held, that a union acts through the instrumentalities of individuals. Certainly an association or organization cannot escape responsibility by standing orders disavowing authority on the part of its officers. . . . Facile arrangments do not create immunity. . .whether they are made by employee or by employer groups." (Citations omitted). Id at 399.
The court finds that there was clear proof that the defendant Champlin and the Union actually participated in or authorized the blocking and impeding of vehicles. Champlin, as Business Manager of the Union was in charge of the line, which was authorized by the Executive Board of the Union. The Executive Board consists of five officers, none of whom are paid or are full time, and there was no evidence that any of them were ever on the picket line. Champlin, however, was present on the line every day, and actually participated in blocking vehicles, and in slowing down the picketers' march; he also personally participated in reforming the circular line so that it elongated to impede vehicles. Champlin conducts the daily business of the Union, dispatches people and negotiates CT Page 6271 contracts. Champlin wrote out and distributed picket line procedures to the picketers, and determined the number of pickets on the line on a daily basis. From these facts, although the plaintiff provided no proof of "the number and status" of the Union's officers personally participating in the unlawful acts of blocking and impeding picket line crossers, the court finds from the evidence that total control of the day-to-day operations of the picket line was delegated to Champlin by the Union, and therefore, as Champlin actually and personally participated in the unlawful acts of blocking and delaying vehicles, both he and the Union are responsible.
As to the threats, jeers, obscenities, intimidation, violence, pounding on vehicles, rock throwing, nail strewing and the like, there is no credible evidence meeting the level of clear proof that Champlin personally participated in any, or authorized or ratified them. Plaintiff provided no evidence that Champlin was present when these acts were committed or that he witnessed, encouraged or condoned any of such acts. There was no clear proof that Champlin knew of such unlawful acts at the time of their occurrence, or who did them, and that he permitted any of the malefactors to remain on the picket line thereafter. Therefore neither the Union nor Champlin may be held responsible for these unlawful acts.
The court turns next to the elements of substantial and irreparable injury (General Statutes section 31-115 (b) ) and lack of as adequate remedy of law section 31-115 (d)), which the plaintiff was required to prove. The plaintiff provided no evidence of any economic losses sustained by it. Here, however, as in Emhart, supra, the plaintiff's rights of free access and egress and use of its property and business were impaired, and the impairment continued on a daily basis. This impairment is substantial and irreparable.
And, there is clearly no adequate remedy at law, because the injury continues, and money damages appear neither calculable or appropriate.
Next, General Statutes section 31-115 (c) requires a balancing test to determine whether, ". . . as to each item of relief granted greater injury would be inflicted upon the complainant by the denial of relief than would be inflicted upon the defendants by the granting of relief. . . ." The court finds that after weighing the equities that American Ref-Fuel's rights of access and use of its property were being violated, although it was not even a party to the underlying dispute between the Union and Abington. The violations of American Ref-Fuel's rights caused and will continue to cause substantial harm. The plaintiff only seeks to enjoin unlawful picketing, and CT Page 6272 recognizes that it must permit the Union to picket lawfully, which the Union has a legal right to do and continue to do. The plaintiff has met its burden of proof on this issue.
The last element that the plaintiff must prove under General Statutes section 31-115 (e) is that the "public officers charged with the duty to protect the complainant's property are unable or unwilling to furnish adequate protection." In this regard, the court had before it the testimony of Lt. Offen, the commander of Troop E of the State Police. Troop E's territory embraces 450 square miles, with 14 towns, including Preston, with does not have an organized police force, and includes 60-65 miles of limited access highways, and unestimated miles of secondary highways. Initially, to respond to the picket line, Lt. Offen had to cut back on other patrol functions and needs, such as delaying other investigations and the like. He testified that his territory had an unusual geographic feature the Thames River, and that his troop was deployed on each side, with only two crossing points, which affects response time. He also testified that there was no state policy to allow "circular" picketing, and that his officers should not have to open the picket line to let vehicles through. He also testified that the officers positioned themselves between the highway (Route 12) and the picketers and physically had to break the line to allow cars through.
Lt. Offen had assigned two troopers to the picket line, but was unwilling to commit any more, so that the remainder of his territory would not go unprotected. As time went on, and after the agreement obtained by the court relating to the conduct of the picket line was reached, Lt. Offen was able to reduce the number of officers. And, as of May 16, 1991, the last day of the court hearings on this case, he testified that the picket line was at an `ideal' level — between 3 and 8 picketers. Lt. Offen also testified on direct examination when called by the defendant that there was no time when the police were either unable or unwilling to provide or furnish protection to the plaintiff. However, on cross examination by the plaintiff, Lt. Offen conceded that if the picket line increased to 15 or more, the police would not be able to provide protection necessary to ensure free access.
The court also had before it video tapes showing the police officers' reactions to the impeding and blockage of entering and exiting vehicles. These showed that the police allowed delays to occur, some of up to two minutes, and allowed the picketers to force cars off the travelled portion of plaintiff's driveway, and appeared only to intervene when entering traffic had backed up onto Route 12, or when conditions became intolerable. CT Page 6273
Under these circumstances, the court finds that the police were unable or unwilling to adequately provide reasonable rights of access and egress to plaintiff's property. In this regard the court considers what would happen upon termination of the consent agreements, or upon the Union increasing the staffing of its picket line. "An injunction is granted with reference to what there is reason to expect in its absence." Emhart, supra, 402.
The defendants' arguments are basically two-fold. First, they claim that the plaintiff has failed to meet the requirement of General Statutes section 31-115. This court disagrees for the reasons set forth. Second, they contend that the issuance of an injunction would be an impermissible prior restraint on their First Amendment rights. The court agrees with the defendant that picketing is constitutionally protected activity, but impeding and blocking free access to one's property is not, even when done as part of picketing activity. Impeding, delaying and blocking free access is not free speech.
The court has considered and balanced the equities in this case, and concludes that the plaintiff is entitled to a temporary injunction forbidding unlawful acts for which the defendants are responsible.
Accordingly, the plaintiff's application for a temporary injunction is granted, and the court's order is annexed hereto and made a part of this memorandum.
Teller, J.