[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON APPLICATION FOR TEMPORARY INJUNCTION
The plaintiff Connecticut Independent Labor Union brings this action to enjoin the defendant Town of Hamden from leasing certain town land to a private entity to operate a golf course, the effect of such lease being that certain bargaining unit members will no longer have the opportunity to work at the site of the leased premises. The defendant town argues that the plaintiff has failed to meet the standards for the issuance of an injunction. CT Page 7930
Since at least the early 1970's, the Town of Hamden has used certain of its land as a golf course known as Laurel View. The course was open to the public and was operated and maintained by town employees. In addition to the actual golf course, there are various buildings associated with the operation of the course. Further there is a "clubhouse" that is large enough for banquets that is located in the golf course area.
The maintenance of the golf course proper was the responsibility of the Hamden Department of Public Works (DPW). Besides supervisors, the DPW employed four members of the plaintiff union to service the course: one mechanic and three maintainers. These employees saw to the upkeep of the motorized maintenance equipment and performed grounds keeping functions. It is the effect of the town's actions on these employees with which the plaintiff union takes issue.
Beginning in early 2000, the Mayor of Hamden began consideration of whether the operation of this public golf course was a necessary "core function" of the town government and whether the income from fees generated by the course otherwise justified the town's staying in the golf course business. By February, the administration of the town had decided not to continue to operate the course, although it continues to operate and maintain the banquet facility. Rather, the decision was made to lease the golf course land to a private entity.
The pro shop had already been under contract to a private operator for some years, and this individual — Matthew Menchetti — who also had a separate contract with the town to be the facility's golf pro, began negotiations on behalf of his private company MDM Golf, LLC, to lease the land and operate the golf course privately. Negotiations were fruitful and by March a draft contract was in place.
Once the town and MDM reached an agreement on the terms of the lease, the town put the approval of the land lease and personal property sale (tractor, rakes, etc.) on the agenda of its public meetings of the Legislative Council, meetings which the union regularly attended. On March 13, 2000, the Legislative Council approved the lease of the Hamden land to MDM.
Beginning in January, 2000, when the Mayor first indicated that the question of operating the golf course was a serious issue, the union began to request information about the finances and operation over prior years and to demand assurances that the employees who maintained the grounds and equipment would not be adversely affected. The union asserted that the town was required to "bargain" over the fate of the four golf course positions. The union contract for that bargaining unit was then CT Page 7931 being renegotiated, and the union attempted to tie in the proposed reassignment of the four golf course positions with the renegotiations on the union contract as a whole. The town conceded its willingness to discuss the affect that privatization of the course might have on the employees who had previously been assigned there, but refused to bargain over what it viewed as the traditional management prerogative of assignment of work. The Mayor stated on more than one occasion that he would make the commitment that the lease of the golf course land would not result in a lay-off of those employees who had previously worked at the course. Moreover the town refused to discuss the issues of the individual golf course employee positions as part of the overall negotiations of the new collective bargaining agreement. Nonetheless the town supplied certain financial information to the union and kept the union reasonably apprised of the status of negotiations over the proposed lease arrangements.
The day after the Legislative Council approved the lease, the union employees were reassigned to other sites in the town to work within their job descriptions at the same rate of pay as they had received at the golf course site. The plaintiff union claims that the workers have been adversely affected because they now have a decreased chance for overtime, they have a later starting time and ending time at work, they have a differently scheduled lunch break time, and they have lost the custom of free golf-playing privileges. The plaintiff union claims that it has been harmed as an entity because its integrity has been assaulted by the unilateral actions of the town in the face of protests by the union. The union filed this action on March 24, 2000.
The response of the town is that none of the standards for granting a temporary injunction have been met, particularly the more stringent standards that the town argues exist in considering whether to issue an injunction in a labor dispute. See Emhart Industries. Inc. v. AmalgamatedLocal Union, 190 Conn. 371, 391-92 (1983). But the court is not convinced that the so-called "Little Norris-LaGuardia Act," Conn. Gen. Stat. §31-112 (c), applies in a situation such as this where it is not disruptive and unlawful union activity that is the object of the injunction, but rather the ordinary activities of the town in running its affairs quite apart from labor-management issues.
Rather the court views the issue as one that involves the ordinary standard for the issuance of a temporary injunction. To prevail on an application for temporary injunction, the plaintiff must demonstrate that it is likely to succeed on the merits; that there is no adequate remedy at law; that it will be irreparably harmed if relief is not granted; and that the balance of equities favors the relief requested. See, e.g.,Griffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451, CT Page 7932 457-61 (1985). This less stringent standard does not benefit the plaintiff, however, because the union has failed to demonstrate that it can meet even this burden.
First the Union has failed to demonstrate that it is likely to succeed on the merits. While it characterizes the action of the town as a "subcontract" of bargaining unit work prohibited by the union contract, the plaintiff ignores the fact that the town has in fact entered into a lease of real estate. For the period of the lease, the town has effectively and lawfully turned over possession of the premises to lessee. The town is no longer entitled to access to the property without the lessee's permission, or as otherwise specified in the lease. In leasing the premises, the lessee retains the exclusive right to determine how to operate and staff the premises that it now occupies.
The court is aware that the issue of "privatization" has been addressed in other legal fora with varying results. Compare In the Matter of Stateof Connecticut Division of Special Revenue and Council 4, AFSCME-AFL-CIONP-3 Bargaining Unit, Connecticut State Board of Labor Relations Decision No. 3364, February 9, 1996, with In the Matter of the City of Waterburyand Local 353, Council 4. AFSCME. AFL-CIO, Connecticut State Board of Labor Relations Decision No. 3206, April 22, 1994. Nonetheless, nothing in the union contract in this case prohibits the town's land lease arrangement, regardless of how it affects the bargaining unit. Nor do the major labor law cases on privatization mandate a different result. See, e.g., First National Maintenance Corp. v. NLRB, 452 U.S. 666 (1981).
Secondly the union is incorrect that it has no adequate remedy at law. In fact there is a whole administrative structure set up by statute to govern the resolution of claims of unfair or prohibited labor practices by municipal employers — the Municipal Employees Relations Act (MERA), Conn. Gen. Stat. § 7-467 through 7-477. The union is entitled to file a complaint with the Connecticut State Board of Labor Relations, under Conn. Gen Stat. § 7-470. Moreover, the State Board of Labor Relations has the authority to entertain a request that it issue an interim "cease and desist" order, pursuant to Regs. Conn. St. Ag. §7-471-36. The time requirements for action by the Board on such a request are speedy. Unless the request is dismissed on the papers or the parties agree to some other time schedule, the Board must commence a hearing within ten days and must issue a decision on the request for interim relief within twenty days of the conclusion of the hearing. Regs. Conn. St. Ag. § 7-471-36 (e). The legal standard for issuing such an interim order is much the same as the standard for temporary injunctive relief: a consideration of the harm to each party, including a determination of whether the harm is irreparable; the probability that the complainant will succeed on the merits; and the interests of the CT Page 7933 public. Regs. Conn. St. Ag. § 7-471-36 (g). Moreover if such an order were issued and the defendant failed to comply, the general counsel to the Board is empowered to seek immediate enforcement through an action in Superior Court. Regs. Conn. St. Ag. § 7-471-36 (h). The fact that the union has failed to exhaust its administrative remedies under the MERA is fatal to its case here.
Third the harm to the union is not irreparable. The union is championing the cause of four employees who are unhappy with their work site assignment and working conditions. The court cannot conclude that the plaintiff is likely to suffer such a blow to its reputation in this skirmish as will have some permanent, not to say irreparable, impact on the integrity of the union. And the affected employees have lost no seniority, are working at comparable jobs — albeit ones that they prefer less than at the golf course — and are suffering no loss of base pay. Should the union eventually succeed, any loss suffered by the employees can be redressed with money and compensatory benefits.
Finally the balance of equities at this point tips decidedly in favor of the town and away from the union. By the time this lawsuit was filed, a contract with the lessee was in place. MDM had hired at least twelve employees to work at the golf course. The golf season was under way and it is now in frill swing, so to speak. To put the lessee effectively out of possession, as the union asks, would create substantial disruption and hardship, not to say further litigation, for the town and those with whom it has contracted in good faith.
The court denies the Application for Temporary Injunction.
Patty Jenkins Pittman, Judge